# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TERRAL EVANS, ET AL.**                                    **CIVIL ACTION**

                                                            **No. 11-2067 C/W**
                                        **11-2068; 11-2069; 11-2182; 11-2348;**
                                        **11-2351; 11-2417; 11-2949; 11-2985;**
**VERSUS**                              **11-2987; 11-3018; 11-3021; 11-3048;**
                                            **11-3049; 12-18; 11-3050**
                                                **REF:  ALL CASES**


**TIN, INC.**                                                  **SECTION I**


## ORDER AND REASONS

Before the Court is a motion to dismiss plaintiffs' claims for punitive damages filed by defendant, TIN, Inc. ("TIN"), pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  Plaintiffs have filed an opposition.[2]  For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### *BACKGROUND*

This lawsuit arises out of the alleged wrongful discharge of contaminants from TIN's paper mill and waste treatment facility located in Bogalusa, Louisiana ("the Bogalusa Paper Mill"), into the Pearl River on or about August 9, 2011.[3]  According to the First Amended and Restated Master Consolidated Class Action Complaint ("the Complaint"), the Pearl River is a scenic and navigable river within St. Tammany Parish, Louisiana, Washington Parish, Louisiana,

---

[1] R. Doc. No. 91.

[2] R. Doc. No. 145.

[3] R. Doc. No. 103, at ¶ 33.

and the State of Mississippi.[4]  Plaintiffs allege, among other things, that the unlawful discharge killed approximately 7,000,000 fish, mussels, and crustaceans living in the Pearl River and the system of tributaries, ponds, bayous, and streams connected to the river.[5]  Plaintiffs claim that the discharge permanently altered the natural balance of the Pearl River from Bogalusa, Louisiana to the mouth of the river at Lake Borgne and the Gulf of Mexico.[6]  Plaintiffs further claim that the contaminants generated by the Bogalusa Paper Mill may cause serious injury to those individuals living along the Pearl River.[7]  Plaintiffs consist of a proposed class of all natural and juridical persons that sustained damage from the discharge, including property owners, businesses, residents, fishermen, and individuals sustaining personal injuries as a result of the discharge.[8]

Plaintiffs allege that TIN owns, operates, and has control over the Bogalusa Paper Mill and any machinery, equipment, activities, and personnel at the mill.[9]  According to the Complaint, TIN's principal place of business is located in Austin, Texas.[10]  Plaintiffs assert, upon information and belief, that defendant, Luther Bennett, was the duly appointed corporate manager and senior officer of the Bogalusa Paper Mill and that one or more of the officers, directors, and managers of TIN, including but not limited to Bennett, were involved in the

---

[4] R. Doc. No. 103, at ¶ 73.

[5] R. Doc. No. 103, at ¶¶ 99-101.

[6] R. Doc. No. 103, at ¶ 97, 102.

[7] R. Doc. No. 103, at ¶ 67, 105-06.

[8] R. Doc. No. 103, at ¶¶ 33-34.

[9] R. Doc. No. 103, at ¶ 49.

[10] R. Doc. No. 103, at ¶ 51.

decision-making process that resulted in the alleged unlawful discharge.[11]  Plaintiffs claim that these officers and directors had power over the operations, production, management, and supervision of the Bogalusa Paper Mill and that they had the means and opportunity to take actions which would have prevented the discharge.[12]

Plaintiffs contend that the proposed class members are entitled to punitive or exemplary damages as a result of TIN's willful misconduct and reckless disregard for public safety.[13] Plaintiffs claim that defendants were motivated solely by their desire to maximize profits and that they acted with careless disregard for the health and safety of the proposed class members.[14] Plaintiffs further claim that defendants failed to timely warn the proposed class members of the discharge of toxic and hazardous substances into the Pearl River.[15]  Plaintiffs seek punitive damages under general maritime law and the laws of Texas and/or Mississippi.[16]

TIN filed this motion to dismiss the claims for punitive damages.  TIN argues that punitive damages are not available under general maritime law because general maritime law is not the substantive law in this case.  TIN also argues that punitive damages are not available under Louisiana law and that Louisiana Civil Code article 3546 does not authorize an award of punitive damages under either Texas law or Mississippi law.  Plaintiffs oppose the motion to dismiss on both grounds.

---

[11]R. Doc. No. 103, at ¶ 52, 58.

[12]R. Doc. No. 103, at ¶ 59, 61.

[13] R. Doc. No. 103, at ¶¶ 94, 305-315.

[14] R. Doc. No. 103, at ¶ 312.

[15] R. Doc. No. 103, at ¶ 313.

[16] R. Doc. No. 103, at ¶ 315.

For the following reasons, the Court agrees with TIN that general maritime law does not apply as the substantive law in this case. However, the Court finds that plaintiffs have sufficiently alleged that punitive damages are available under Texas and/or Mississippi law pursuant to Article 3546. Accordingly, TIN's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## *STANDARD OF LAW*

A district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted if the plaintiff has not set forth a factual allegation in support of his claim that would entitle him to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007); *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007). As the Fifth Circuit explained in *Gonzalez v. Kay:*

> "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court recently expounded upon the *Twombly* standard, explaining that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955, 167 L.Ed.2d 929). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

577 F.3d 600, 603 (5th Cir. 2009).

This Court will not look beyond the factual allegations in the pleadings to determine whether relief should be granted. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In assessing the complaint, a court must

accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey*, 197 F.3d at 774; *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 Fed. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

## *DISCUSSION*

### I. Punitive Damages under the General Maritime Law

TIN argues that general maritime law does not authorize an award of punitive damages because general maritime law is not the substantive law in this case. It is well-settled that "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*, 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995); *Sisson v. Ruby*, 497 U.S. 358, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S. Ct. 2654, 73 L. Ed. 2d 300 (1982); *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S. Ct. 493, 34 L. Ed. 2d 454 (1972). Plaintiffs must, therefore, show that the alleged wrongful discharge of contaminants into the Pearl River satisfies both the location test and the connection test in order to obtain an award of punitive damages under general maritime law.

### A. Maritime Location

The maritime location test requires that a plaintiff demonstrate that the tort occurred on navigable water or, if the injury was suffered on land, that it was it was caused by a vessel on navigable water. *Scarborough v. Clemco Indus.*, 391 F.3d 660, 663 (5th Cir. 2004) (citing *Grubart*, 513 U.S. at 534-35). In order to determine whether the alleged tort occurred on

navigable water, the Court must look "to where the alleged wrong took effect rather than to the locus of the allegedly tortious conduct." *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999) (citing *Wiedemann & Fransen A.P.L.C. v. Hollywood Marine, Inc.*, 811 F.2d 864 (5th Cir. 1986); *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283, 288-89 (5th Cir. 1989)); *see also Parker v. Gulf City Fisheries, Inc.*, 803 F.2d 828, 828-29 (5th Cir. 1986); *Raffray v. Gulf Logistics, LLC*, No. 10-1017, 2010 WL 5055849, at * 2-3 (E.D. La. Dec. 2, 2010) (Fallon, J.). "[T]here must be a direct and major manifestation or impact occurring on navigable waters." *Barnes v. United States*, No. 96-1764, 1997 WL 149970, at *1 (E.D. La. Mar. 26, 1997) (Mentz, J.) (citing *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283, 288–89 (5th Cir. 1989); *Parker*, 803 F.2d at 828-29).

Plaintiffs have sufficiently alleged that the discharge of contaminants into the Pearl River satisfies the location test. The discharge is alleged to have killed millions of fish and other forms wildlife in a manner that produced a direct and major manifestation or impact on the river and its system of tributaries. Although the discharge may have originated from a land-based facility, the proposed class of property owners, commercial and recreational fishermen, as well as others who use the Pearl River for business or recreational purposes, claim to have sustained their injuries on navigable water as a result of the environmental damage caused by the discharge. *See Raffray*, 2010 WL 5055849, at *3 (holding that the location test was satisfied when a crane operated from a platform caused injury onboard a vessel in the Gulf of Mexico) (citing *Egorov*, 183 F.3d at 456). Because plaintiffs have sufficiently alleged that the tort took effect on navigable water, the location test is satisfied.

### B. Maritime Connection

The maritime connection test has two requirements. "A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' " *Grubart*, 513 U.S. at 534 (citations omitted). "Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.' " *Id.* (citing *Sisson*, 497 U.S. at 365, 364 & n.2). "[A]s long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second nexus prong." *Grubart*, 513 U.S. at 541. The analysis must be conducted based on a "description of the incident at an intermediate level of possible generality." *Id.* at 538.

### 1. Whether the Incident has a Potentially Disruptive Impact on Maritime Commerce

The first prong of the connection test is easily satisfied. The incident involved in this case may be described, in general terms, as a massive discharge of pollution from a land-based industrial facility into navigable water. Defendants do not dispute that this incident had a potentially disruptive impact on maritime commerce. The potential need for extensive environmental remediation as a result of a massive discharge of pollution carries an obvious threat to disrupt normal commercial maritime activities. Accordingly, plaintiffs have sufficiently alleged that the incident had a potentially disruptive impact on maritime commerce.

### 2. Whether the General Character of the Activity Giving Rise to the Incident Shows a Substantial Relationship to Traditional Maritime Activity

The activity giving rise to the incident in this case may similarly be described, in general terms, as a massive discharge of pollution into navigable water from a land-based industrial facility. "The key inquiry is whether the allegedly tortious activity is 'so closely related to

activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand.' " *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 669 (5th Cir. 2006) (quoting *Grubart*, 513 U.S. at 539-40); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1118 -19 (5th Cir. 1995). Despite the potential impact on maritime commerce, the general character of the activity giving rise to the incident in this case was neither maritime in nature nor substantially related to any traditional maritime activities. Plaintiffs have not alleged that TIN's land-based industrial activities involved navigation, seamen, safety aboard vessels, or other more traditional maritime activities. *See In re Katrina Canal Breaches Litig.*, 324 Fed. App'x 370, 380, 2009 WL 1162552, at *6 (5th Cir. Apr. 30, 2009); *see also Barasich v. Shell Pipeline Co.*, No. 05-4180, 2006 WL 3913403, at *4 (E.D. La. Nov. 20, 2006) (Barbier, J.) (holding that a hurricane-related oil spill did not satisfy the connection test because the land-based pipeline and storage tanks from which the oil escaped did not have a substantial relationship to traditional maritime activity). Because the allegations in the Complaint do not satisfy the second prong of the maritime connection test, general maritime law does not apply as the substantive law in this case. Accordingly, plaintiffs' claims for punitive damages under general maritime law are **DISMISSED**.

## II. Punitive Damages under State Law

TIN also argues that plaintiffs' claims for punitive damages under the laws of Texas and/or Mississippi law must be dismissed. TIN contends that Louisiana substantive law, which does not authorize an award of punitive damages, is applicable in this case. Plaintiffs respond that they have sufficiently alleged that punitive damages are available under the laws of Texas and/or Mississippi law pursuant to conflict of law provisions set forth in Louisiana Civil Code article 3546. Plaintiffs contend that this Court should defer resolving fact-intensive conflict of

law issues until trial or until such time as discovery is completed and the evidence is established. TIN replies that there is no need to defer ruling on its motion to dismiss because the allegations in the Complaint, taken as true, fail to show that Article 3546 authorizes an award of punitive damages in this case.

This Court must apply Louisiana conflicts law to determine which state's substantive law governs the availability of punitive damages. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Louisiana Civil Code article 3546 provides that punitive damages may not be awarded by a court in Louisiana unless authorized:

> (1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or

> (2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.

In general, then, punitive damages may be awarded when they are "authorized under the law of the state or states with two or more of the following contacts: (a) place of the injurious conduct; (b) place of the resulting injury; and (c) place of the defendant's domicile." *Arabie v. Citgo Petroleum Corp.*, --- So.3d---, 2012 WL 798758, at *18 (La. March 13, 2012) (Knoll, J.) (concurring in part and dissenting in part). "An award of punitive damages is authorized when such damages are imposed by the laws of all three or any two of the states referenced in the article." *In re Train Derailment Near Amite, LA., on October 12, 2002*, No. 03-1531, 2004 WL 169805, at *2 (E.D. La. Jan 26, 2004) (Zainey, J.); La. Civ. Code. art 3546 cmt. (b).

"Once the facts pertaining to the parties' and the dispute's contacts with various states are established, the Court is to decide the choice of law issue as a matter of law." *Mayo v. Hartford*

*Life Ins. Co.*, 220 F. Supp. 2d 714, 730 & n.4 (S.D. Tex.2002). "Courts in this circuit have held that factual determinations which are antecedent to the choice of law determination may properly be determined by the district court 'after considering the affidavits, depositions, and other matters submitted by the parties.' " *So. Serv. Corp. v. Tidy Bldg. Servs., Inc.*, No. 04-1362, 2004 WL 2784909, at *4 (E.D. La. Dec. 1, 2004) (Africk, J.) (quoting *Nunez v. Hunter Fan Co.*, 920 F. Supp. 716, 718 (S.D.Tex.1996)). In assessing the availability of punitive damages with respect to Federal Rule of Civil Procedure 12(b)(6), however, the Court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *see also So. Serv. Corp.*, 2004 WL 2784909, at *4 (taking the allegations in the complaint as true and declining to make a definitive determination on choice of law issues with respect to a motion for judgment on the pleadings).

### A. Whether Punitive Damages are Authorized by the Law of the State where the Injurious Conduct Occurred

The first consideration set forth in Article 3546 is whether punitive damages are authorized by the law of the state where the injurious conduct occurred. Plaintiffs argue that this consideration weighs in favor of applying Texas law because the discharge resulted from certain corporate-level decisions made by defendants domiciled in Texas. TIN responds that the Complaint does not contain any particular allegations of tortious conduct occurring in Texas by TIN's managers or directors. TIN argues that the Complaint contains allegations of tortious conduct that occurred only in Bogalusa, Louisiana, at TIN's paper mill. TIN further notes that the Complaint specifically alleges that "the situs of events and omissions giving rise to the claims asserted herein are . . . TIN's Paper Mill located in the City of Bogalusa, Washington Parish, Louisiana."

In *Arabie v. Citgo Petroleum Corp.*, --- So.3d---, 2012 WL 798758, at *8 (La. March 13, 2012), the Louisiana Supreme Court held that "management or corporate level decisions must outweigh tortious activity which occurs locally in order for the location of the corporate or management decision to be considered the locale of the injurious conduct." *See also In re Train Derailment*, 2004 WL 169805, at *2 (holding that the actions of certain management-level employees did not "outweigh or equal the allegedly tortious conduct that occurred in Louisiana.").

In *Arabie*, the Court focused its analysis on the impact of an oil company's out-of-state corporate-level decisions with respect to a catastrophic oil spill that occurred at an oil refinery located in Louisiana. A severe rainstorm caused the refinery's wastewater storage tanks to overflow, resulting in the release of more than 1 million gallons of "slop oil" into the Calcasieu River. *Arabie*, 2012 WL 798758, at *1. The Court rejected the finding that "significant funding, steerage, and budget decisions leading to the underbuilding of the wastewater treatment facility, and ultimately the spill, were made at corporate headquarters in Texas and Oklahoma in furtherance of profit enhancement." *Id.* at *8-*9. As the Court explained, 21 million gallons of wastewater overflowed from the refinery's two existing storage tanks. *Id.* Although corporate-level decisions delayed construction of a third 10 million gallon storage tank, the Court reasoned that the extra storage tank would not have prevented the oil spill. *Id.* In contrast, the Court noted that nine instances of local failure contributed to the spill, including disrepair of the facility's oil skimmers, substandard dikes, failure to keep the tanks filled at a safe level, nonfunctional emergency side draws, and substandard preventative maintenance. *Id.* Because the company's corporate-level decisions would not have prevented the oil spill due to the volume of the overflow and the disrepair of the wastewater facilities, the Court held that any tortious corporate-

level decisions did not outweigh the tortious conduct that "occurred in and could have been corrected in Louisiana."[17]  *Id.*

Reading the Complaint as a whole, and construing all factual allegations in the light most favorable to plaintiffs, the Court finds that plaintiffs have sufficiently alleged that corporate-level decisions occurring in Texas outweighed any tortious activity that occurred locally.  Plaintiffs allege that TIN, which maintains its principal place of business in Austin, Texas, owns, operates, and has control over the Bogalusa paper mill as well as all machinery, equipment, activities and personnel located at or performing services at the paper mill and its related facilities.[18]  Although the Complaint states that "the situs of events and omissions giving rise to the claims asserted herein are . . . TIN's Paper Mill,"[19] that statement, read in context, does not limit the allegations to activities occurring solely at the Bogalusa Paper Mill.  The Complaint proceeds to state that "one or more officers or directors, including but not limited to Defendant Bennett, was/were involved in the decision-making process which resulted in the subject discharge(s) or release(s)  . . . ."[20] Plaintiffs further allege that "one or more officers or directors of the Defendant TIN, including but not limited to the Defendant Bennett, had the means and the opportunity to take actions which would have prevented the subject discharge(s) or release(s) into the Pearl River . . . ."[21] Although a close call, when construed in the light most favorable to plaintiffs, the allegations in the Complaint paint a pattern of tortious conduct by officers and directors located

---

[17] Although the Court reached this conclusion in connection with its consideration of the defendant's domicile, it acknowledged that its reasoning had "determined that the 'injurious conduct' occurred in Louisiana" such that article 3546 would not provide for the imposition of punitive damages.  *Arabie*, 2012 WL 798758, at *9 n.2.  The Court explained that it would proceed to consider the defendant's domicile by assuming that the injurious conduct occurred in Texas.  *Id.*

[18]  R. Doc. No. 103, at ¶¶ 49, 51.

[19] R. Doc. No. 103, at ¶ 50.

[20] R. Doc. No. 103, at ¶ 58.

[21] R. Doc. No. 103, at ¶ 59.

in Texas that resulted in the discharge, including but not limited to, the decisions of defendant, Luther Bennett, who is alleged to be "a resident of and domiciled in the State of Texas."[22]

Plaintiffs, of course, must ultimately prove that such conduct did, in fact, occur in Texas, and that it outweighs any tortious activity that occurred locally. *See Arabie*, 2012 WL 798758, at *8. At this early stage of the proceedings, however, the Court finds that plaintiffs have sufficiently alleged that injurious conduct occurring in Texas outweighed the injurious conduct occurring in Louisiana. Because punitive damages are available under Texas law,[23] plaintiffs have sufficiently alleged that punitive damages are authorized by the law of the state where the injurious conduct occurred.

### B. Whether Punitive Damages are Authorized by the Law of the State where the Resulting Injury Occurred

The second consideration set forth in Article 3546 is whether punitive damages are authorized by the law of the state where the resulting injury occurred. Comment (i) under Article 3543 provides guidance for cases, such as this one, in which the injury is alleged to have occurred in more than one state. *See* La. Civ. Code. art. 3546 cmt(e). That comment provides in relevant part as follows:

> Cases involving multiple victims who sustained their respective injuries in different states should be handled independently for each victim. Cases where the same victim sustained injury in more than one state should be resolved by a factual determination of where the injury was primarily suffered. . . .

---

[22] R. Doc. No. 103, at ¶ 7.

[23] Under Texas law, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." Tex. Civ. Prac. & Rem. Code § 41.003(a)(1)-(3).

La. Civ. Code. art 3543, cmt (i). Because this case involves multiple victims who allegedly sustained their respective injuries in different states, i.e., Louisiana and/or Mississippi, the Court will determine the location of the injury independently for each victim.

With respect to those plaintiffs who claim to have sustained their injuries in Mississippi ("the Mississippi plaintiffs"), the parties agree for the purposes of this motion that punitive damages are authorized by the laws of the state where their injuries occurred, i.e., Mississippi. The Mississippi plaintiffs have, therefore, sufficiently alleged that punitive damages are authorized by the law of the state where the injurious conduct occurred, i.e., Texas, and by the law of the state where the resulting injury occurred, i.e., Mississippi. Having satisfied the requirements of the first instance described in subparagraph (1) of Article 3546,[24] the Mississippi plaintiffs have stated a claim for punitive damages as authorized under the laws of Texas and/or Mississippi.

With respect to those plaintiffs who claim to have sustained their injuries in Louisiana ("the Louisiana plaintiffs"), the parties agree that punitive damages are not authorized by the laws of the state where their injuries occurred, i.e., Louisiana.[25] For that reason, punitive damages are not available for the Louisiana plaintiffs either pursuant to the first instance described in subparagraph (1) of Article 3546 or pursuant to subparagraph (2) of Article 3546. Accordingly, the Court will proceed to consider whether punitive damages are authorized by "the law of the place where the person whose conduct caused the injury was domiciled" in order to

---

[24] The first instance described in subparagraph (1) of Article 3546 considers whether punitive damages are authorized by the law of the state where the injurious conduct occurred and by the law of the state where the resulting injury occurred. La. Civ. Code art. 3546(1).

[25] "Under Louisiana law, punitive or other 'penalty' damages are not allowable unless expressly authorized by statute." *International Harvester Credit Corp. v. Seale*, 518 So. 2d 1039, 1041 (La. 1988). There is no Louisiana statute authorizing the recovery of punitive damages with respect to the claims asserted in this case.

determine whether the Louisiana plaintiffs have stated a claim for punitive damages pursuant to the second instance described in subparagraph (1) of Article 3546. [26]

### C. Whether Punitive Damages are Authorized by the Law of the Place where TIN was Domiciled

As stated, the Louisiana plaintiffs must show that punitive damages are authorized pursuant to the second instance described in subparagraph (1) of Article 3546 by showing that punitive damages are authorized by the law of the place where TIN was domiciled.[27] "As pertains to conflict of laws questions, a party's domicile shall be determined according to Articles 3518 and 3548 of the Civil Code." *Arabie*, 2012 WL 798758, at *5. Article 3518 provides as follows:

> For the purposes of this Book, the domicile of a person is determined in accordance with the law of this state. A juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.

Although TIN is a juridical person formed outside of Louisiana, and its principal place of business is located in Austin, Texas, Article 3548 further provides:

> For the purposes of this Title, and provided it is appropriate under the principles of Article 3542, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.

---

[26] The second instance described in subparagraph (1) of Article 3546 considers whether punitive damages are authorized by the law of the state where the injurious conduct occurred and by the law of the place where the person whose conduct caused the injury was domiciled. La. Civ. Code art. 3546(1).

[27] The precise language of Article 3546(1) provides that "punitive damages may not be awarded by a court of this state unless authorized: . . . [b]y . . . the law of the place where *the person whose conduct caused the injury* was domiciled." (emphasis added). In this case, plaintiffs allege that the officers, directors, and management of defendant, TIN, including but not limited to defendant, Bennett, are responsible for the decision-making process which resulted in the injury. R. Doc. No. 103, at ¶¶ 51-64. Plaintiffs further allege that defendant, TIN, is vicariously responsible for all actions, inactions, errors and omissions, and violations by its directors, officers, employees, and/or any other person for whom TIN is legally responsible for any of the events giving rise to any of the claims set forth in the Complaint. R. Doc. No. 103, at ¶ 62. Taking these allegations as true, the Court will proceed for the purposes of this motion on the basis that defendants are the "person[s] whose conduct caused the injury." *See* La. Civ. Code art. 3546(1).

Article 3518 and Article 3548 can be harmonized. *Arabie*, 2012 WL 798758, at *5. Under Article 3548, TIN is a juridical person that is domiciled outside Louisiana pursuant to Article 3518. Since it transacts business in Louisiana, however, and it is alleged to have incurred a delictual obligation arising from its activities in Louisiana, Article 3548 provides that TIN shall be treated as a Louisiana domiciliary, provided that it is appropriate under the principles set forth in Article 3542. *See id.*

In order to resolve the issue of whether punitive damages are authorized by the state where TIN is domiciled, the Court, therefore, must determine whether it is appropriate under the principles set forth in Article 3542 to consider TIN a Louisiana domiciliary for the purposes of awarding punitive damages. Article 3542 provides as follows:

> Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

This code article provides an illustrative list of several nonexclusive factors that is "neither exhaustive nor hierarchical, and is intended to discourage a mechanistic counting of contacts . . . [T]he evaluation of factual contacts should be qualitative rather than quantitative, and should be made in light of the policies of each contact-state that are pertinent to the particular issue in dispute." *Arabie*, 2012 WL 798758, at *7 (quoting La. Civ. Code art. 3542, cmt (a)).

In *Arabie* the Louisiana Supreme Court identified and analyzed the following factors when determining whether it would be appropriate under the principles set forth in Article 3542 to consider the defendant-oil company a Louisiana domiciliary :

> (1) The pertinent contacts of each state to the parties; (2) their contacts to the events giving rise to the dispute, including the place of conduct and injury; (3) the domicile, habitual residence, or place of business of the parties; (4) the state in which the relationship between the parties was centered; (5) deterring wrongful conduct; and (6) repairing the consequences of injurious acts. The article also imports from Article 3515 the following factors: (7) the relationship of each state to the parties and the dispute; and (8) the policies and needs of the interstate system, including the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

As applied to the facts of that case, the Court explained that the first factor weighed in favor of applying Louisiana law because Texas and Oklahoma, the location of the oil company's principal places of business, had contacts only with the oil company, while Louisiana, the location of the oil spill, had contacts with all parties. *Id.* at *8. The second factor weighed in favor of applying Louisiana law because the injurious corporate-level decisions occurring in Texas and Oklahoma did not outweigh the tortious conduct that occurred in Louisiana at the refinery. *Id.* at *8-*9. As for the third factor, while the oil company was incorporated in Delaware and it maintained its principal places of business in Oklahoma and Texas, the third factor favored applying Louisiana law because the company operated a large refinery in Louisiana that employed 1,400 to 1,800 employees. *Id.* at *10. The fourth factor heavily weighed in favor of applying Louisiana law because the relationship between the parties was centered in Louisiana. *Id.* Although the fifth and sixth factors were neutral, the seventh factor weighed in favor of applying Louisiana law because Louisiana had a closer relationship to the parties and the dispute for many of the same reasons discussed in the first four factors. *Id.* The

eighth factor also weighed in favor of imposing Louisiana law because it would be unlikely for the oil company to anticipate that ordinary budget decisions made at corporate headquarters would result in imposition of Texas law when the oil spill occurred and caused damage in Louisiana. *Id.* The Court also noted that the oil company would have reasonably expected that Louisiana law would apply under such circumstances. *Id.* Finally, neither Texas nor Oklahoma had an overriding interest in applying their laws to corporate decisions which had no effect in those states and which were not the primary cause of injury in another state. *Id.* Accordingly, the Court concluded that it would be appropriate under the principles set forth in Article 3542 to consider the oil company a Louisiana domiciliary under Article 3548.

Applying the *Arabie* factors to the facts alleged in this case, the first factor, the pertinent contacts of each state to the parties, weighs in favor of applying Louisiana law. The Complaint alleges that TIN maintains its principal place of business in Texas, but that it owns and operates the Louisiana paper mill that caused the alleged wrongful discharge. The Louisiana plaintiffs are those plaintiffs that allegedly sustained injury in Louisiana as a result of the discharge of contaminants into the Pearl River. There are no allegations that plaintiffs had any contact with Texas. As a result, the allegations show that Texas had contact only with TIN, while Louisiana had contact with both TIN and the Louisiana plaintiffs.

The second factor is neutral. This factor considers the contacts of the states with the events giving rise to the dispute, including the place of conduct and injury. As explained above, plaintiffs have sufficiently alleged at this stage of the proceeding that the injurious conduct consisted of corporate-level decisions that occurred in Texas. The Louisiana plaintiffs sustained their injuries in Louisiana. Taking the allegations in the Complaint as true, this factor is neutral because Texas and Louisiana had equal contacts with the events giving rise to the dispute.

The third factor, the domicile, habitual residence, or place of business of the parties, weighs slightly in favor of applying Louisiana law. In this case, the Louisiana plaintiffs are obviously domiciled in Louisiana. TIN is a foreign corporation with its principal place of business in Austin, Texas, but it is allegedly authorized to do and does business in Washington Parish, Louisiana. The Complaint alleges that TIN owns and operates the Bogalusa Paper Mill, which was the source of the alleged discharge in Louisiana. Although these facts weigh in favor of applying Louisiana law, the strength of this factor is weakened by the lack of allegations with respect to the extent of TIN's operations in Louisiana and Texas. *See id.* at *10 (holding that the third factor weighed in favor of applying Louisiana law because CITGO, which was incorporated in Delaware with its principal places of business in Tulsa and Houston, operated one of the largest refineries in Louisiana, which covered 500 acres and employed 1,400 to 1,800 workers). Construing all factual allegations in the light most favorable to plaintiffs, the third factor weighs only slightly in favor of applying Louisiana law.

The fourth factor, however, weighs heavily favors applying Louisiana law. This factor considers the state in which the relationship between the parties was centered. The only contact between the parties in this case is alleged to have occurred in Louisiana as a result of a discharge of contaminants into the Pearl River from the Bogalusa Paper Mill. The Complaint does not allege that the parties had any contact with each other in Texas.

The fifth and sixth factors are neutral. Although the fifth factor, deterring wrongful conduct, favors imposing punitive damages by applying Texas law,[28] the strength of this factor "is diminished by Louisiana's policy disfavoring punitive damages in general." *See id.*

---

[28] As stated above, the Complaint alleges, among other things, that "the Defendants are liable to the class members for punitive damages under Texas Civil Practice and Remedies Code § 41.003, the common law of Texas . . . and/or Mississippi law as a result of the Defendants' gross negligence, willful misconduct and wanton indifference . . . ." *See* R. Doc. No. 103, at ¶ 315.

Similarly, "The imposition of punitive damages . . . has no bearing on the sixth factor, that of repairing the consequences of injurious acts" because plaintiffs may be made whole by an award of compensatory damages. *See id.* Accordingly, these two factors are neutral.

The seventh factor weighs in favor of applying Louisiana law. This factor considers the relationship of each state to the parties and the dispute. As noted in *Arabie*, it involves many of the same facts relevant to the first four factors. *See id.* The relationship between Texas and the parties centers on corporate-level decisions made in Texas by TIN's officers and managers. Louisiana's relationship with the parties includes TIN's alleged ownership and operation of the Bogalusa Paper Mill in Louisiana and the residence, place of employment, and/or place of recreation of the Louisiana plaintiffs. The dispute centers on an alleged discharge of pollution which occurred in Louisiana and which caused damage and injury in Louisiana. This lawsuit was also filed in Louisiana. As a result, Louisiana has the closer relationship to the parties and the dispute in this case.

The eighth factor, however, weighs in favor of applying Texas law. This factor considers the policies and needs of the interstate system, including the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state. TIN likely anticipated that willful, wanton, and/or grossly negligent conduct occurring at its principal place of business in Texas would result in imposition of Texas law. Although TIN may have equally anticipated that a massive discharge of pollution into the Pearl River would result in imposition of Louisiana law, Texas has a "strong interest in insuring that [its] corporate citizens are punished for gross environmental negligence so as to deter them from future wrongful actions." *Arabie*, 2012 WL 798758, at *19-*20 (Knoll, J.) (concurring in part and dissenting in part). Louisiana has no

countervailing interest in protecting a Texas tortfeasor that causes injury in Louisiana because its policy in disallowing punitive damages "is to protect its [own] domiciliaries from excessive legal liability." *See id.* Accordingly, the eighth factor weighs in favor of applying Texas law.

Considering the foregoing factors qualitatively rather than quantitatively, and "in light of the policies of each contact-state that are pertinent to the particular issue in dispute," *Arabie*, 2012 WL 798758, at *7 (quoting La. Civ. Code art. 3542, cmt (a)), the Court finds that plaintiffs have sufficiently *alleged* at this early stage in the proceeding that the policies of Texas would be more seriously impaired than those of Louisiana if its law were not applied in this case. Utilizing the standard which the Court must employ with respect to resolving a Rule 12(b)(6) motion, the Louisiana plaintiffs have sufficiently alleged that punitive damages are authorized by the state where the injurious conduct occurred, i.e., Texas, and by the state where TIN was domiciled, i.e., Texas. Accordingly, the Louisiana plaintiffs have stated a claim for punitive damages pursuant to the second instance described in subparagraph (1) of Article 3546.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion to dismiss the claims for punitive damages under general maritime law is **GRANTED** and such claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion to dismiss the claims for punitive damages under the laws of Texas and/or Mississippi pursuant to Louisiana Civil Code article 3546 is **DENIED.**

New Orleans, Louisiana, April 26, 2012.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**