UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**TERRAL EVANS, ET AL.**                                                    **CIVIL ACTION**

                                                                           **No. 11-2067 C/W**
                                                             **11-2068; 11-2069; 11-2182; 11-2348;**
                                                             **11-2351; 11-2417; 11-2949; 11-2985;**
**VERSUS**                                                   **11-2987; 11-3018; 11-3021; 11-3048;**
                                                                    **11-3049; 12-18; 11-3050**
                                                                           **REF: ALL CASES**

**TIN, INC.**                                                               **SECTION I**

## ORDER AND REASONS

Before the Court is a motion[1] to compel arbitration and to stay the litigation filed by defendant, North America Specialty Insurance Company ("NAS"). The American Insurance Company has joined that motion.[2] Plaintiffs and defendant, TIN, Inc. ("TIN"), have filed oppositions.[3] For the following reasons, the motions are **DENIED**.

### *BACKGROUND*

This lawsuit arises out of the alleged wrongful discharge of contaminants from TIN's paper mill and waste treatment facility located in Bogalusa, Louisiana ("the Bogalusa Paper Mill"), into the Pearl River on or about August 9, 2011.[4] The consolidated action involves sixteen cases brought by a proposed class of all natural and juridical persons that allegedly sustained damage from the discharge, including property owners, businesses, residents,

---

[1] R. Doc. No. 196.

[2] R. Doc. No. 198.

[3] R. Doc. Nos. 225, 226.

[4] R. Doc. No. 103, at ¶ 33.

1

fishermen, and individuals sustaining personal injuries as a result of the discharge.[5] The defendants include TIN, five general commercial liability ("GCL") insurance carriers, seven directors and officers ("D&O") liability insurance carriers, and five difference-in-conditions ("DIC") insurance carriers.[6] The insurance companies were made defendants in this matter directly pursuant to the Louisiana Direct Action Statute ("LDAS"), La. Rev. Stat. Ann. §§ 22:1269, *et seq.*[7]

On April 20, 2012, NAS filed a motion to compel arbitration and to stay the litigation.[8] NAS provides third-layer excess liability insurance coverage to TIN that attaches at $60,000,000.[9] NAS requests an order of this Court compelling plaintiffs to arbitrate the dispute in accordance with an arbitration provision contained in the NAS policy issued to TIN.[10] NAS contends that the agreement to arbitrate is enforceable against the direct action plaintiffs in this case because they are third-party beneficiaries to the NAS policy or are otherwise bound as nonsignatories under state contract law. NAS contends that it is entitled to compel arbitration and to stay the litigation pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*.

Plaintiffs and TIN oppose the motion to compel arbitration and to stay the litigation. They argue that the LDAS voids or annuls the arbitration clause to the extent it is being used to defeat plaintiffs' right of direct action. Although they acknowledge that the LDAS would ordinarily be preempted by the FAA, plaintiffs and TIN contend that the LDAS reverse preempts

---

[5] R. Doc. No. 103, at ¶¶ 33-34.

[6] R. Doc. No. 103, at ¶¶ 6-23.  The D&O and DIC insurers have been dismissed.  R. Doc. Nos. 284, 305.

[7] R. Doc. No. 103, at ¶ 24.

[8] R. Doc. No. 196.

[9] R. Doc. No. 196-1, at p. 2.

[10] R. Doc. No. 196.

the FAA pursuant to the McCarran-Ferguson Act, 15 U.S.C. § 1012, *et seq*. For the following reasons, this Court agrees with plaintiffs and TIN that NAS is not entitled to compel plaintiffs to arbitrate or to stay the litigation.

### *STANDARD OF LAW*

The FAA provides that the U.S. District Courts shall enforce arbitration agreements by issuing an order directing the parties to engage in arbitration and staying litigation in any case raising a dispute referable to arbitration. 9 U.S.C. §§ 3, 4; *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 389 n.1 (2006) (quoting *Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp.*, 460 U.S. 1, 22, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)). The FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on the application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

"Courts conduct a bifurcated inquiry to determine whether parties should be compelled to arbitrate a dispute." *Washington Mut. Fin. Grp. v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004) (quoting *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)). "In ruling upon a motion to compel arbitration, the court first determines whether the parties agreed to arbitrate the particular type of dispute at issue."[11] *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (citing *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007)). "Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable." *Bailey*, 364 F.3d at 263

---

[11] To determine whether the parties have agreed to arbitrate a particular claim, this Court must consider: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003).

3

(citing *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)).  "The FAA expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Bailey*, 364 F.3d at 263 (quoting *Brown*, 304 F.3d at 471).

## *DISCUSSION*

### I.  Whether NAS has Waived its Right to Arbitrate

As a preliminary matter, the Court must determine whether NAS has waived its right to arbitrate.  Plaintiffs and TIN contend that NAS has waived its right to arbitrate because it did not file its motion to compel arbitration until nearly eight months after the lawsuit commenced. They observe that plaintiffs filed this action on August 21, 2011, TIN tendered the lawsuit and sought coverage on October 3, 2011, NAS denied coverage on December 19, 2011, and NAS did not file its motion to compel arbitration until April 20, 2012.  Plaintiffs and TIN contend that they have expended substantial time, effort, and money conducting discovery and otherwise participating in the litigation and that they would be prejudiced by NAS's delay if they were forced to abandon their efforts and start anew before an arbitration panel.

NAS responds that it has not waived its right to arbitrate by engaging in any substantial delay before filing this motion to compel arbitration.  NAS contends that neither plaintiffs nor TIN raised any dispute regarding coverage until NAS was served with the complaint on February 20, 2012.  NAS further argues that the claims of prejudice by plaintiffs and TIN are overstated because they do not show that arbitration would require the parties to "start anew" or that any discovery that has already been completed would be irrelevant to the arbitration proceedings.

The Fifth Circuit has recognized that "[w]aiver of arbitration is not a favored finding and there is a presumption against it." *Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159,

1164 (5th Cir. 1987); *Subway Equipment Leasing v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999) ("There is a strong presumption against waiver of arbitration"); *Walker v. J .C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991) ("In general, we hesitate to find that a party has waived its contractual right to arbitration."); *Moses H. Cone Mem'l Hosp.,* 460 U.S. 1, 24-25, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability."). "That burden 'falls even more heavily' when the party seeking arbitration 'has included a demand for arbitration in its answer.'" *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 897 (5th Cir. 2005) (quoting *Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 238 (5th Cir. 1998)). NAS included such a demand in the sixteenth affirmative defense listed in its answer.[12]

  The Court finds that plaintiffs and TIN cannot carry their heavy burden of showing that NAS waived its right to arbitrate. "Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999) (quoting *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986)). "To invoke the judicial process '[t]he party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.'" *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004) (quoting *Subway*, 169 F.3d at 329)). "Substantial invocation may be found based on various acts constituting litigation conduct including the filing of dispositive motions and extensive participation in discovery." *MC Asset*

---

[12] R. Doc. No. 173, at p. 53.

*Recovery, LLC v. Castex Energy, Inc.*, No. 07-076, 2009 WL 900745, at *4 (N.D. Tex. Apr. 3, 2009). "When one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial . . . . Substantially invoking the litigation machinery qualifies as the kind of prejudice . . . that is the essence of waiver." *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986) (quoting *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 559 F.2d 268, 269 (5th Cir. 1977)).

Plaintiffs and TIN have not shown that NAS substantially invoked the judicial process to their detriment. NAS evinced its desire to resolve this dispute in arbitration from the outset when it timely filed its answer to the complaint on April 4, 2012.[13] NAS filed its motion to compel arbitration less than three weeks after filing its answer. Plaintiffs and TIN have not shown that NAS engaged in acts constituting litigation conduct such as filing dispositive motions or extensively participating in discovery. As plaintiffs and TIN have not carried their burden of establishing that NAS substantially invoked the judicial process to their detriment, the Court finds that NAS has not waived its right to arbitrate.

**II. Whether Plaintiffs are Bound by the Agreement to Arbitrate in the NAS Policy**

NAS contends that plaintiffs are bound as nonsignatories to the agreement to arbitrate contained in the NAS policy because plaintiffs have sought benefits under the NAS insurance policy by filing this direct action lawsuit. In *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009), the U.S. Supreme Court held that a nonsignatory to an arbitration agreement can compel parties to arbitrate under the FAA when "the relevant state contract law allows him to enforce the agreement." *Id.* at 632. The Court explained that section

---

[13] *See id.*

6

2 of the FAA "creates substantive federal law regarding the enforceability of arbitration agreements, requiring courts 'to place such agreements upon the same footing as other contracts.'" *Id.* at 629-30 (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)). The Court further explained that a nonsignatory to an arbitration contract may be compelled to arbitrate as a matter of substantive federal law when "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver [or] estoppel.' " *Id.* at 631 (citing 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)). Because the FAA does not "purport[] to alter background principles of state contract law regarding the scope of agreements," courts must look to state law to determine which contracts are enforceable against third parties.[14] *Id.* at 630-31.

The Fifth Circuit has identified several issues that district courts may need to consider in light of the Supreme Court's decision in *Carlisle* when determining whether a nonsignatory can be bound by an agreement to arbitrate: (1) whether the arbitration agreement addresses whether or not a nonsignatory can be bound to arbitrate; (2) what law applies to determine whether the nonsignatory must arbitrate; (3) whether all of the plaintiff's causes of action fall within the scope of the arbitration agreement; and (4) whether any state anti-arbitration laws trump the federal policy favoring arbitration. *See Todd v. Steamship Mut. Underwriting Ass'n (Bermuda)*

---

[14] As explained below, the Court premised its holding on the condition that the relevant state contract law be generally applicable to all contracts, and that it not single out arbitration agreements for invalidation. *See Carlisle*, 556 U.S. at 630 (" '[S]tate law,' therefore, is applicable . . . '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' " (emphasis in original) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)). The Court has recognized that "[a] state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the FAA]." *Perry*, 482 U.S. at 492 n.9. The reason is that "[a]n agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law 'save upon such grounds as exist at law or in equity for the revocation of *any* contract.' " *Id.* at 492 n.9 (internal citation omitted) (emphasis in original) (quoting 9 U.S.C. § 2).

*Ltd.*, 601 F.3d 329, 335-36 (5th Cir. 2010); *Todd v. Steamship Mut. Underwriting Ass'n, Ltd.*, No. 08-1195, 2011 WL 1226464 (E.D. La. Mar. 28, 2011) (Berrigan, J.).  The list is nonexhaustive and "should be considered within the framework of a full analysis of whether [a nonsignatory] can be bound to arbitrate."  *Todd*, 601 F.3d at 336.

### A. Whether the NAS Insurance Policy Addresses whether a Nonsignatory can be Bound to Arbitrate

The Court does not find that the NAS insurance policy clearly addresses whether a nonsignatory can be bound to arbitrate.  The original NAS policy provided in relevant part as follows:

> Any dispute, controversy or claim arising out of or relating to this policy or the breach, termination or invalidity thereof shall be finally and fully determined in New York, New York under the provisions of the United States Federal Arbitration Act, U.S. Code, Title 9, and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators to be selected for each controversy as follows:
>
> Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter. . . .[15]

The arbitration clause is silent as to whether third parties can be forced to arbitrate disputes falling within the scope of the arbitration agreement.  Although TIN observes that the arbitration clause was amended to replace the terms "party" and "parties" with the terms "**Insured**" or "the Insurer,"[16] the amendment does not clearly address whether third parties such as plaintiffs can be required to arbitrate as third-party beneficiaries.  Because the arbitration clause does not rule out the possibility of arbitration by third parties, the Court will proceed to consider whether plaintiffs are bound by the arbitration agreement.

---

[15] R. Doc. No. 196-3, at p. 9.

[16] *See id.* at 17.

8

### B. What Law Controls Whether Plaintiffs may be Compelled to Arbitrate

The Supreme Court's decision in *Carlisle* emphasized that courts must look to state law to determine which contracts are enforceable against third parties through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver [or] estoppel." *Carlisle*, 556 U.S. at 631 (internal quotation omitted). NAS contends that a choice of law analysis reveals that Texas law controls whether the NAS policy is enforceable against nonsignatories. Plaintiffs and TIN respond that even if Texas contract law applied to the interpretation of the NAS policy, the arbitration clause is being used to defeat plaintiffs' right of direct action and that no choice of law analysis is required to determine the threshold question of whether the arbitration clause is voided or annulled by the LDAS.

The parties do not dispute that the LDAS applies in this case or that it authorizes plaintiffs' direct action. The LDAS provides, in relevant part, as follows:

> The injured person or his survivors or heirs . . . , at their option, shall have a right of direct action against the insurer within the terms and limits of the policy . . . This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana . . . .

"When the [direct action] statute is applicable and authorizes a direct suit against a tortfeasor's insurer, the statute is read into and becomes a part of a policy written pursuant thereto, even though the policy does not contain the language required by the statute, or contains language prohibited by the statute." *Quinlan v. Liberty Bank & Trust Co.*, 575 So. 2d 336, 352 (La. 1991) (on rehearing). Regardless of whether Texas law or Louisiana law will ultimately govern enforceability of the arbitration clause against third parties, "The insurer cannot insert 'terms and limits' in a policy that would contravene the right of the injured party to bring a direct action as

9

provided by the Act." *Matter of Talbott Big Foot, Inc.*, 887 F.2d 611, 613 (5th Cir. 1989) (citing *Rambin v. Southern Sales Co.*, 145 So. 46, 50 (La. Ct. App. 1932)). As a result, the Court must determine whether or not the arbitration clause is voided or annulled by the LDAS before conducting the choice-of-law analysis and determining whether plaintiffs are bound as nonsignatories.[17]

### C. Whether the NAS Arbitration Agreement is superseded by the LDAS

The threshold question, then, is whether NAS's arbitration clause contravenes plaintiffs' right of direct action such that it is superseded by the LDAS. The Louisiana Direct Action Statute ("LDAS") provides, in relevant part, as follows:

> The injured person or his survivors or heirs . . . , at their option, shall have a right of direct action against the insurer within the terms and limits of the policy . . . This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana . . .
>
> It is the intent of this Section that any action brought under the provisions of this Section shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this state.

La. Rev. Stat. Ann. § 22:1269. "Louisiana courts have held that terms and conditions of a policy that have the effect of defeating the purpose of the direct action statute, such as 'no action'

---

[17] This conclusion is consistent with the Supreme Court's decision in *Carlisle* and with the district court's decision in *Todd* on remand from the Fifth Circuit. In both *Carlise* and *Todd*, the courts assumed the existence of a valid agreement to arbitrate. The district court in *Todd* built on that assumption by looking to the appropriate state law to determine whether a direct-action plaintiff was bound as a nonsignatory to an arbitration agreement. However, the court declined to consider the threshold question of whether or not the arbitration agreement ran afoul of Louisiana anti-arbitration laws because the FAA would supersede such laws in a case brought under the New York Convention. *See Todd v. Steamship Mut. Underwriting Ass'n, Ltd.*, No. 08-1195, 2011 WL 1226464, at *6-*8 (E.D. La. Mar. 28, 2011) (Berrigan, J.) (citing *Safety Nat'l Cas. Corp. v. Certain Underwriters At Lloyd's, London*, 587 F.3d 714, 717 (5th Cir. 2009) (en banc)). Because this case was not brought under the New York Convention, the Court must now consider that question.

clauses, are annulled or superseded by the statute." *Zimmerman v. Int'l Cos. & Consulting, Inc.*, 107 F.3d 344, 346 (5th Cir. 1997) (citing *Matter of Talbott Big Foot, Inc.*, 887 F.2d 611, 612-13 (5th Cir. 1989) (collecting cases)) *both overruled on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009). "As the Louisiana Supreme Court stated in refusing to enforce a no action clause, such clauses 'must yield' to the provisions of the direct action statute." *Big Foot*, 887 F.2d at 613 (citing *Ruiz v. Clancy*, 162 So. 734, 735 (La. 1935)).

In *Matter of Talbott Big Foot, Inc.*, 887 F.2d 611, 612-13 (5th Cir. 1989), the Fifth Circuit considered whether an arbitration clause violates the LDAS and, if so, whether the LDAS permits an injured claimant to proceed without submitting to arbitration notwithstanding the federal policy favoring arbitration. Describing the first question as "one of Louisiana law," the Fifth Circuit concluded that an arbitration clause used to require tort victims to await the outcome of an arbitration between the insurer and the tortfeasor is indistinguishable from a no action clause in the effect its enforcement has on a direct action. The Court explained that

> [b]oth purport to require an injured party to await the outcome of another proceeding before he can file an action against the insurer: A no action clause requires a plaintiff to await the outcome of a separate suit to determine the insured's liability; the arbitration clause, as [the insurer] seeks to use it, requires the injured parties to await a separate arbitration proceeding in which coverage is determined.

*Id.* at 613. Turning to the second question, the Fifth Circuit rejected the argument that "the strong federal policy favoring arbitration should override any contrary Louisiana policy." *Big Foot*, 887 F.2d at 614. The court reasoned that "[t]his would be a powerful argument if appellants were parties to the contract that contains the arbitration clause . . . We are unaware of any federal policy that favors arbitration for parties who have not contractually bound themselves to arbitrate their disputes." *Id.*

Eight years later, in *Zimmerman v. International Companies and Consulting, Inc.*, 107 F.3d 344, 345-47 (5th Cir. 1997), the Fifth Circuit again considered whether an insurer's contractual right to arbitrate coverage issues with its insured entitled it to a court order staying a tort victim's direct action during arbitration. The Fifth Circuit flatly held, "The answer is still 'no.' " *Id.* at 345.

In *Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329 (5th Cir. 2010), the Fifth Circuit recognized that its decisions in *Big Foot* and *Zimmerman* ultimately rested on reasoning that had been rejected by the Supreme Court in *Carlise*.  In both *Big Foot* and *Zimmerman*, the Fifth Circuit had rejected the argument that the federal policy favoring arbitration should override the LDAS.  The Fifth Circuit had reasoned that no federal policy favors arbitration for parties who have not contractually bound themselves to arbitrate their disputes.  However, the Supreme Court concluded in *Carlisle* that non-signatories to an arbitration agreement (such as  direct action plaintiffs) can be compelled to arbitrate to the extent they could be bound as nonsignatories to any other contract provision.  As a result, in *Todd*, the Fifth Circuit acknowledged that *Carlisle* had overruled its "determination in *Zimmerman* and *Big Foot* that direct action plaintiffs need never arbitrate under federal law because they are not parties to the insurance policies creating an obligation to arbitrate." *Todd*, 601 F.3d at 334.

Significantly, the Fifth Circuit did not repudiate its first conclusion in *Big Foot* and *Zimmerman*, namely, that the LDAS will void or annul arbitration agreements under certain circumstances as a matter of Louisiana law.  Rather, the Fifth Circuit explained that it would have built upon that conclusion by "engag[ing] in a deeper analysis" to determine whether the

12

LDAS reverse preempts the strong federal policy favoring arbitration pursuant to the McCarran-Ferguson Act.[18] *Id.* at 335.  The court stated:

> In *Zimmerman,* in addition to holding that the FAA does not apply to nonsignatories, we also stated that direct action plaintiffs cannot be forced to arbitrate as third party beneficiaries of insurance contracts because "the direct action statute grants a personal injury claimant a right of direct action against the tortfeasor's insurer on the policy regardless of any provision in the policy forbidding an immediate direct action." 107 F.3d at 346. In this case, Steamship has asserted that Todd must arbitrate his claims because, among other reasons, he is purportedly a third party beneficiary of Delta Queen's insurance policy. We conclude that on remand, the district court is not bound by our statement in *Zimmerman* that direct action plaintiffs cannot be required to arbitrate as third party beneficiaries, as this conclusion was necessarily contingent on our now discredited view that federal arbitration law has no application to nonsignatories.
>
> In *Zimmerman,* when we stated that direct action plaintiffs could not be compelled to arbitrate as third party beneficiaries, we justified this conclusion by finding that Louisiana law allows them to proceed without submitting to arbitration. 107 F.3d at 346 (explaining that "the direct action statute grants a personal injury claimant a right of direct action ... regardless of any provision in the policy forbidding an immediate direct action"). However, if we had found the FAA applicable in *Zimmerman,* we would have had to engage in a deeper analysis: Although state contract law principles control whether nonsignatories can be bound to arbitrate, *see Carlisle,* 129 S. Ct. at 1901-02, state law usually *cannot* invalidate an otherwise enforceable agreement simply because it is an agreement to arbitrate. Consequently, we would have had to address whether Louisiana's direct action statute can permissibly render nonarbitrable a claim that could possibly be arbitrable otherwise under state contract law principles.

*Id.*

This Court is now called upon to finish that thought and it will proceed in accordance with the Fifth Circuit's instructions and consider whether the NAS arbitration clause is voided or

---

[18] The Court notes, however, that prior to *Todd*, the Fifth Circuit had, in passing, characterized "*Big Foot*'s assumption that an arbitration clause is no different from a no-action clause" as "unnecessary to the holding and therefore dictum." *See Acosta v. Master Maintenance and Const. Inc.*, 452 F.3d 373, 378 n.7 (5th Cir. 2006).

annulled by the LDAS and, if so, whether plaintiffs' right of direct action under the LDAS reverse preempts the FAA pursuant to the McCarran-Ferguson Act.

### 1. Whether the Arbitration Clause is Voided or Annulled by the LDAS

The Court must first determine whether the arbitration clause at issue in this case would defeat the purpose of the direct action statute in a manner similar to those described by the Fifth Circuit in *Big Foot* and *Zimmerman*. In both *Big Foot* and *Zimmerman*, the insurers sought an order staying the seamen's suits until the insurers had exercised their right to arbitrate with the seamen's employers. In this case, however, NAS seeks an order to compel *plaintiffs* to arbitrate. Arguably, such requests do not have the effect of defeating the purposes of the direct action statute because they merely ask plaintiffs to pursue their claims in a different forum.

While recognizing that this circumstance is "somewhat different" than *Big Foot* and *Zimmerman*, the Fifth Circuit ultimately rejected that argument in *Todd*. *Todd*, 601 F.3d at 333. The court explained that the reasoning in *Big Foot* and *Zimmerman* "would sweep broadly enough to rule out arbitration" even where the plaintiff was being asked to participate in the arbitration. *Id.* The court stated that "[i]f *Zimmerman* were correct that the federal policy favoring arbitration has no application to direct action plaintiffs, then Steamship could not compel Todd to arbitrate." *Id.* Consistent with that decision, if the LDAS reverse preempts the FAA, then NAS cannot compel plaintiffs to arbitrate because the arbitration clause would "require an injured party to await the outcome of another proceeding before he can file an action against the insurer." *See Big Foot*, 887 F.2d at 613.

### 2. Whether the LDAS Reverse-Preempts the FAA pursuant to the McCarran- Ferguson Act

Having determined that the arbitration clause is voided or annulled by the LDAS, the Court must next determine whether the LDAS reverse preempts the FAA pursuant to the McCarran-Ferguson Act, 15 U.S.C. § 1012, *et seq*. The Supreme Court has explained that

> An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law*, save upon such grounds as exist at law or in equity for the revocation of *any* contract. Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. [However, a] state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the FAA].

*Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 96 L.Ed.2d 426 (1987) (emphasis in original) (internal citations and quotations omitted).

This strong federal policy in favor of arbitration would ordinarily preempt a conflicting state law such as the LDAS. However, the McCarran-Ferguson Act allows a state law to reverse preempt federal law when: (1) the federal statute does not specifically relate to the "business of insurance;" (2) the state law was enacted for the "purpose of regulating the business of insurance;" and (3) the federal statute operates to "invalidate, impair, or supercede" the state law." *Am. Bankers Ins. Co. of Fl. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (citing *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998)); 15 U.S.C. § 1012(b) ("[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."). Because the parties do not dispute that the FAA does not specifically relate to the business of insurance or that the FAA would operate to invalidate, impair, or supercede the right of direct action under the LDAS, the Court will focus on whether the LDAS was "enacted for the 'purpose of regulating the business of insurance.' "

"The category of laws enacted 'for the purpose of regulating the business of insurance' is broad and consists of those laws 'that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance.' " *Munich*, 141 F.3d at 590 (quoting *U.S. Treas. Dep't. v. Fabe*, 508 U.S. 491, 505, 113 S. Ct. 2202, 2210, 124 L. Ed. 2d 449 (1993)). "Statutes that focus on protecting the relationship between the insurer and insured are laws regulating the business of insurance." *Munich*, 141 F.3d at 590 (citing *Fabe*, 508 U.S. at 501). The Supreme Court has identified three criteria for determining whether a state law regulates the business of insurance: (1) "whether the practice in question has the effect of transferring or spreading a policyholder's risk;" (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured;" and (3) "whether the practice is limited to entities within the insurance industry." *See Inman*, 436 F.3d at 493 (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982)). While none of the *Pireno* factors is determinative, an examination of the factors may lead to the conclusion that a state law regulates the business of insurance. *Id.*

In *American Bankers Ins. Co. of Florida v. Inman*, 436 F.3d 490 (5th Cir. 2006), the Fifth Circuit held that a state law prohibiting arbitration clauses in contracts for uninsured motorist insurance reverse preempted the FAA pursuant to the McCarran Ferguson Act. The only question before the Fifth Circuit in *Inman* was whether Miss. Code Ann. § 83-11-109 regulated the business of insurance. With respect to the first *Pireno* factor, the Fifth Circuit explained that prohibiting arbitration of disputes over uninsured motorist coverage "regulates risk by subjecting all policy disputes regarding uninsured/underinsured motorist coverage to the possibility of a jury trial." *Id.* at 494 (citing *Standard Sec. Life Ins. Co. of N.Y. v. West*, 267 F.3d 821, 824 (8th Cir. 2001); *McKnight v. Chicago Title Ins. Co.*, 358 F.3d 854, 858 (11th Cir. 2004)). The court

rejected the argument that "it is an arbitrary decision to prohibit arbitration in one type of contract." *Id.* The court explained that the enactment of § 83-11-109 was designed to protect those injured by uninsured motorists and that the statute stood as "a determination by the Mississippi legislature to control the risks and harms caused by uninsured and underinsured motorists." *Id.* As for the second factor, the court held that § 83-11-109 is an integral part of the insurer-insured relationship because it controls how coverage disputes will be resolved. *Id.* (citing *West*, 267 F.3d at 823; *McKnight*, 358 F.3d at 858; *Mut. Reinsurance Bureau v. Great Plains Mut. Ins. Co.*, 969 F.2d 931, 933 (10th Cir.1992)). Because there was no dispute with respect to the third factor, the Court concluded that each of the *Pireno* factors weighed in favor of finding that § 83-11-109 was enacted for the purpose of regulating the business of insurance.

Following the Fifth Circuit's reasoning in *Inman*,[19] the Court finds that the LDAS—and its effect on the arbitration clauses—qualifies as a statute that was enacted for the purpose of regulating the business of insurance. First, the LDAS "regulates risk by subjecting all policy disputes regarding [insurance] coverage to the possibility of a jury trial." *See Inman*, 436 F.3d at 494 (citing *West*, 267 F.3d at 824; *McKnight*, 358 F.3d at 858). Second, the LDAS forms "an integral part of the insurer-insured relationship because it controls how disputes regarding [insurance] coverage will be resolved." *See Inman*, 436 F.3d at 494 (citing *West*, 267 F.3d at 823; *McKnight*, 358 F.3d at 858; *Mut. Reinsurance Bureau v. Great Plains Mut. Ins. Co.*, 969 F.2d 931, 933 (10th Cir. 1992)).[20] Finally, the LDAS only applies with respect to claims

---

[19] The Court notes with particular interest that the Fifth Circuit sitting *en banc* has questioned the reasoning in *Inman*. *See Safety Nat. Cas. Corp. v. Certain Underwriters At Lloyd's, London*, 587 F.3d 714, 720 n.21 (5th Cir. 2009) (en banc). The Fifth Circuit expressed considerable doubt with respect to whether resolving claims in an arbitration rather than in a court or before a jury has the effect of spreading or transferring a policyholder's risk. The court also questioned whether an anti-arbitration statute is necessary to protect policyholders. However, the court declined to reconsider *Inman*, which continues to bind this Court.

[20] Although the parties have not attempted to distinguish *Inman* based on the fact that the LDAS regulates the insurer-injured person relationship rather than the insurer-insured relationship, *see e.g.*, *SEC v. Nat'l Sec., Inc.*, 393

asserted under "polic[ies] or contract[s] of liability insurance" and it is, therefore, limited to entities within the insurance industry. *See* La. Rev. Stat. Ann § 22:1269(A).

In summary, the Court finds that the FAA does not specifically relate to the business of insurance, that the LDAS was enacted for the purpose of regulating the business of insurance, and that the FAA operates to "invalidate, impair, or supercede" the LDAS. As a result, the LDAS reverse preempts the FAA pursuant to the McCarran-Ferguson Act and it prevents NAS from compelling plaintiffs to arbitrate their claims.

### D.  Other Considerations

In light of this Court's conclusion that the arbitration clause is voided or annulled by the LDAS, the Court does not reach the remaining considerations identified by the Fifth Circuit in *Todd*. Having determined that NAS cannot enforce the arbitration clause against plaintiffs, there is no need to conduct a choice of law analysis to determine what law controls whether a nonsignatory must arbitrate or to determine whether all of plaintiffs' causes of action fall within the scope of the arbitration agreement.

### *CONCLUSION*

For the foregoing reasons,

---

U.S 453, 460, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969); *Fabe*, 508 U.S. at 508-09 (holding that an Ohio priority statute was enacted for the purpose of regulating the business of insurance to the extent that it regulated policyholders, but not to the extent that it furthered the interests of other creditors), the distinction is immaterial. The LDAS expressly provides that "[i]t is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable; and, that it is the purpose of all liability policies to give protection and coverage to all insureds . . . for any legal liability the insured may have as or for a tortfeasor within the terms and limits of the policy." La. Rev. Stat. Ann. § 22:1269(D). The prohibition on arbitration clauses used to defeat an injured person's right of direct action is reasonably necessary to ensure that "all liability policies . . . are executed for the benefit of all injured persons . . . to whom the insured is liable." *See Fabe*, 508 U.S. at 505-09; La. Rev. Stat. Ann. § 22:1269(D). The LDAS, therefore, falls within "the broad category of laws . . . that possess the 'end, intention, or aim' of . . . 'protecting or regulating' the performance of an insurance contract." *See Fabe*, 508 U.S. at 505.

**IT IS ORDERED** that the motions to compel arbitration and to stay the litigation are **DENIED**.

New Orleans, Louisiana, June 19, 2012.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**