UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TERRAL EVANS ET AL.                                        CIVIL ACTION

                                                          No. 11-2067 C/W
                                    11-2068; 11-2069; 11- 2182; 11-2348;
                                    11- 2351; 11-2417; 11- 2949; 11-2985;
                                    11-2987; 11-3018; 11- 3021; 11-3048;
VERSUS                                  11-3049; 12-18; 11-3050; 12-2042;
                                    12-2424; 12-2815; 12-2819; 12- 2824;
                                                       12-2825; 12-2367
                                                     REF:  ALL CASES

TIN, INC. ET AL.                                             SECTION I

ORDER AND REASONS

        Before the Court is a motion to award common benefit expenses and fees and to allocate

the common benefit fees.[1] This Court has carefully considered the record, the memoranda

submitted to the Court, the evidence presented in connection with an evidentiary hearing held on

July 25, 2013, the special master's report and recommendation, and the law.  For the following

reasons, the motion to award common benefit expenses and fees is **GRANTED** and the proposed

allocation is **APPROVED**.   Additionally, contingency fee contracts for privately retained

lawyers will be **LIMITED** to 20% of any individual claimant's recovery.

Background

**I.  Factual Background**

        This lawsuit arises out of the alleged wrongful discharge of contaminants from TIN,

Inc.'s paper mill and waste treatment facility located in Bogalusa, Louisiana ("the Bogalusa

Paper Mill") into the Pearl River on or about August 9, 2011.  According to the First Amended

_____

[1] R. Doc. Nos. 683 and 689.

and Restated Master Consolidated Class Action Complaint ("the Complaint"), the Pearl River is a scenic and navigable river within St. Tammany Parish, Louisiana, Washington Parish, Louisiana, and the State of Mississippi.  The Bogalusa Paper Mill is located approximately 50 nautical miles from the mouth of the Pearl River at Lake Borgne and the Gulf of Mexico.

In their Complaint, plaintiffs alleged, among other things, that the unlawful discharge killed approximately 7,000,000 fish, mussels, and crustaceans living in the Pearl River and the system of tributaries, ponds, bayous, and streams connected to the river.  Plaintiffs claimed that the discharge permanently altered the natural balance of the Pearl River from Bogalusa, Louisiana to the mouth of the river at Lake Borgne and the Gulf of Mexico.   Plaintiffs further claimed that the contaminants generated by the Bogalusa Paper Mill may cause serious injury to those individuals living along the Pearl River.

Plaintiffs also alleged in the Complaint that TIN, Inc. ("TIN") owns, operates, and has control over the Bogalusa Paper Mill and any machinery, equipment, activities, and personnel at the mill.[2] Plaintiffs asserted, among other things, that defendant, Luther Bennett, was the duly appointed corporate manager and senior officer of the Bogalusa Paper Mill and that one or more of the officers, directors, and managers of TIN, including but not limited to Bennett, were involved in the decision-making process that resulted in the alleged unlawful discharge. Plaintiffs claimed that these officers and directors had power over the operations, production, management, and supervision of the Bogalusa Paper Mill and that they had the means and opportunity to take actions which would have prevented the discharge. Plaintiffs claimed that defendants were motivated solely by their desire to maximize profits and that they acted with careless disregard for the health and safety of the proposed class members.  Plaintiffs further

---

[2] According to the Complaint, TIN's principal place of business is located in Austin, Texas.

claimed that defendants failed to timely warn the proposed class members of the discharge of toxic and hazardous substances into the Pearl River.  TIN has denied and continues to deny the allegations and all charges of wrongdoing or liability.

Plaintiffs have also alleged that several insurance companies issued various insurance policies to TIN.  The insurance companies were made defendants directly pursuant to the Louisiana Direct Action Statute, La. Rev. Stat. Ann, § 22:1269, *et seq.* The insurance companies denied coverage for the incident and continue to disclaim any liability for the incident.

## II.  Procedural Background

The relevant procedural background was accurately set forth by the parties in their joint motion for final approval of the class settlement.  As jointly recalled by the parties, the lead case in this consolidated proceeding was the first of 33 cases filed in various federal and state courts beginning less than one week after the discharge.  During the course of this litigation, the parties have completed significant amounts of discovery, including numerous depositions, multiple sets of written interrogatories, requests for production, and requests for admission, considerable expert work, and production of several hundred  thousand pages of documents.

A trial of a small group of class members' claims was set to commence on December 10, 2012 and it was expected to last three weeks.   In anticipation of these bellwether trials, plaintiffs submitted initial global expert reports, and both plaintiffs and TIN were in the process of preparing expert reports for individual plaintiff properties.  The parties were poised to take a number of expert depositions, file a number of motions in limine, and incur significant trial-related time and expenses on behalf of their respective clients.

Simultaneously with these efforts to prepare for the trial, the parties worked diligently towards a negotiated resolution of all claims related to the incident.  Starting in May 2012, the

parties commenced mediation under the supervision of a neutral mediator, John W. Perry, Jr. Mr. Perry was heavily involved in all stages of the settlement negotiations and met with the parties numerous times both in person and via telephone conferences. Settlement negotiations were adversarial, conducted at arms-length, and counsel for both sides vigorously represented their clients' interests during the negotiations.

On September 29, 2012, the plaintiffs' steering committee ("PSC") and TIN executed a term sheet regarding a proposed settlement framework for resolution of matters related to the incident and setting forth the essential terms of this settlement. The PSC and TIN's insurance carriers reached an agreement to resolve plaintiffs' claims against the insurance carriers on October 5, 2012.

## III.  The Settlement Agreement

The class action settlement resolved all claims related to the incident, except for certain "later-manifested bodily injury" claims. The amended settlement agreement established the following three subclasses that collectively compose the settlement class:

> **The Real Property Owners Subclass** consists of all non-Business Entity real property owners who at any time between August 8, 2011 and December 14, 2012 owned real property in the Class Area. The "Class Area" includes all privately-owned real property (1) between (a) 1/2 mile west of the West Pearl River, the Pearl River Canal or Porters River and (b) 1/2 mile east of the East Pearl River and (2) within a quarter-mile radius of the waste water treatment system associated with TIN's pulp and paper manufacturing facility in Bogalusa, Louisiana. (See also Ex. H, Class Area map.) TIN will establish a $4.25 million fund for the Real Property Owners Subclass.
>
> **The Business Entities Subclass** consists of all Business Entities— including all companies, corporations, partnerships, sole proprietorships, and non-profit organizations or any other commercial or business entities—that (1) at any time between August 8, 2011 and December 14, 2012 either owned or leased real property in the Class Area; or (2) hold a commercial fishing

license issued by the United States and/or the States of Louisiana or Mississippi for which a fee has been paid, that derive an income from catching and selling seafood, and that have suffered economic loss at any time from August 8, 2011 to December 14, 2012 as a result of the Incident. TIN will establish a $2.75 million fund for the Business Entities Subclass.

**The Other Impacted Persons Subclass** consists of all persons or Business Entities (except for members of the Real Property Owners Subclass or Business Entities Subclass, none of whom may be a member of the Other Impacted Persons Subclass) who (1) resided within the Class Area between August 8, 2011 and December 14, 2012 but who did not own real property within the Class Area during that period; (2) are named as plaintiffs in the Litigation or any other Related Action; (3) submitted a questionnaire in the Litigation or any other Related Action; or (4) otherwise suffered injury, loss, or damage as a result of the Incident, including recreational users of the Pearl River. TIN will establish a $1.5 million fund for the Other Impacted Persons Subclass.

In consideration of the settlement and class release of all claims against the released parties related to the incident, TIN established the three settlement funds outlined above as well as a $500,000 "other losses" fund to address certain damages potentially applicable to members of all three subclasses. The parties agreed that if the amount in any of the four settlement funds were to exceed the total amount of approved claims submitted for that particular subclass, then any monies remaining would be distributed to the other settlement funds to address approved claims submitted by other subclasses. In the event there is money remaining in any of the settlement funds after all approved claims are paid, the parties agreed it will be donated to one or more charities or other public interest entities related to the Pearl River ecosystem.

In addition, TIN has established and partially funded a $4.5 million settlement administration fund to cover expenses associated with administering the settlement, including the cost of class notice, the notice agent, the settlement administrator, the special master, the lien resolution administrator, the escrow agent, and accountants supporting the special master.

Within 30 days of the effective date of the settlement, TIN and the insurance carriers agreed to satisfy their remaining funding obligations with respect to the settlement administration fund. The parties also agreed that if an award for attorney's fees and costs is approved by the Court pursuant to Federal Rule of Civil Procedure 23(h), the settlement administration fund will be the sole source for payment of any such Court approved fees and costs incurred in prosecuting actions related to the incident.  Accordingly, class members will not be responsible for paying Court approved attorney's fees or costs from their recovery of settlement benefits.

Consistent with the amended settlement agreement, class members seeking compensation from the settlement funds have submitted proof of claim forms substantiating their damage claims.  For certain class members, such as individuals and business entities owning real property within the class area and residents of the class area, the amended settlement agreement provides that the special master will establish a "base compensation amount" following review of all proof of claim forms submitted.  The amended settlement agreement then provides a framework for valuing the claims by increasing the base compensation amount based on the nature of the property.

For other class members, such as those alleging damage to a business entity on the Pearl River, impaired use of the Pearl River (such as recreational fishermen) or bodily injury, the special master will value claims based on the evidence required by the amended settlement agreement and provided with the proof of claim forms.  For instance, the amended settlement agreement provides that any member of the business entities subclass alleging economic loss due to the incident must submit evidence of the class member's profits in a post-incident period (any two or more consecutive weeks in the two months following the incident) and earnings from the same period in the prior year.

**IV.  Notice, Fairness Hearing, and Claims Administration**

On December 27, 2012, this Court granted preliminary approval of the proposed settlement between the parties, conditionally certified the settlement class, ordered notice to potential class members, and provided potential class members with an opportunity either to exclude themselves from the class or to object to the proposed settlement.  On February 7, 2013, this Court entered an amended order, affirming its earlier order but issuing revised dates for dissemination of notice of the proposed settlement. The Court also provisionally approved the procedure for giving notice and the forms of notice, and set a final fairness hearing to take place on July 10, 2013.

Since this Court's preliminary approval of the settlement, the Court-appointed notice agent has provided direct notice to all known putative class members and published the class settlement notice-short format ("Short Notice").  The notice agent provided the class settlement notice-long format ("Long Notice") to the PSC and other plaintiffs' counsel for distribution to their respective clients and mailed it to 1,628 additional putative class members jointly identified by the parties.  The notice agent also mailed 1,604 copies of a summary notice to potential class members residing in areas where tax assessor records evidencing land ownership were unavailable.  The Short Notice was published in nine local newspapers between February 20 and March 8, 2012 and in three publications related to recreational fishing.  Finally, the notice agent established a website and toll-free number to answer questions about the settlement and the process for claiming settlement funds.

Class members were required to submit a proof of claim form to the settlement administrator, including evidence substantiating their claim, by May 29, 2013.  A total of 2,073 putative class members submitted proof of claim forms as follows:

> 528 putative class members filed proof of claim forms identifying themselves as members of the real property owners subclass;
>
> 59 putative class members filed proof of claim forms identifying themselves as members of the business entities subclass; and
>
> 1,356 putative class members filed proof of claim forms identifying themselves as members of the other impacted persons subclass.

Of the 2,073 proof of claim forms filed, 130 forms did not select a subclass.

Class members had the opportunity to exclude themselves from the settlement (i.e., "opt out") by mailing written requests for exclusion.  A class member who opted out would not have received any benefits from the settlement, but could have sued or continued to sue TIN and the other released parties in the future.  Class members also had the chance to object and indicate a desire to express their opinions regarding the settlement or amended settlement agreement at the fairness hearing.   No class members opted out of the settlement. Only five class members objected to the settlement, and each of those objections has subsequently been withdrawn.  No class members appeared at the fairness hearing for the purpose of objecting to the settlement.

## V.  Motion for Attorney's Fees and Expenses

On July 10, 2013, the Court approved the class action settlement as fair, adequate, and reasonable. Common benefit counsel now seek an award of common benefit fees in the amount of $3,495,000, which represents 25.89% of the $13,500,000 settlement.  The PSC and associated common benefit counsel have jointly proposed an allocation of the fees.   Common benefit counsel also seek a deduction in the amount of $805,000 from the settlement administration fund for reimbursement of common benefit expenses and settlement administration costs.

On July 25, 2013, this Court held a hearing on the motion for attorney's fees and expenses.  The parties submitted declarations attesting to the nature of the work they performed along with records of their time and expenses.  The time and expense records were independently

reviewed by Philip A. Garrett, CPA, who was appointed by the Court to provide an accounting of common benefit expenses and fees.  Mr. Garrett was questioned during the hearing regarding the accuracy of the timesheets and expense records.  All common benefit counsel were provided an opportunity to object to the accuracy and/or methodology of the proposed fee award. Although two common benefit attorneys initially objected to the proposed allocation, they were able to resolve their objections during the hearing.  The Court took the motion under submission at the conclusion of the hearing.

### Standard of Law

The Court must independently analyze the reasonableness of the requested amount of attorney's fees even though they have been determined based upon an agreed framework proposed in the settlement agreement. *See Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849-50 (5th Cir. 1998); *see also* Fed. R. Civ. P. 23(e). "The court must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), and not merely 'ratify a pre-arranged compact.' " *Id.* (quoting *Piambino*, 610 F.2d 1306, 1328 (5th Cir. 1980)).  The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *See Johnson*, 488 F.2d at 717-19.

"In common fund cases, courts typically use one of two methods for calculating attorneys' fees: (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643-44 (5th Cir. 2012).  The Fifth Circuit has endorsed both approaches and it has afforded "district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations." *Id.*

The Court finds that the percentage method is the preferred method for ensuring the reasonableness of the requested fee in this case for the reasons that have been widely recognized by courts in other common fund cases.  *See e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859-61 (E.D. La. 2007) (Fallon, J.) (citing cases).  The Fifth Circuit has recognized that "district courts in this Circuit regularly use the percentage method blended with a *Johnson* reasonableness check, and for some it is the 'preferred method.'" *Union Asset*, 669 F.3d at 643.  The Court will also conduct a rough lodestar cross check as is the customary practice to ensure that the requested amount of attorney's fees is reasonable.  *See Turner*, 472 F. Supp. 2d. at 861.  "The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a rough cross check on the reasonableness of the fee arrived at by the percentage method." *Id.*

<u>Discussion</u>

**I.  Attorney's Fees**

  **A.  Common Benefit Fees**

As previously stated, the PSC and associated common benefit counsel seek an award of common benefit fees in the amount of $3,495,000,[3] which represents 25.89% of the $13,500,000 settlement.[4] According to the Manual for Complex Litigation, "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund," with a fee of 25% "represent[ing] a typical benchmark." Federal Judicial Center, *Manual for Complex Litig.* § 14.121 (4th ed. 2007). Courts have generally accepted 25% as a "typical benchmark," but refine the analysis using data sets showing the average percentage fee award for the size of the client recovery. The data sets in the empirical study conducted by Professors Eisenberg and Miller are commonly used by district courts in this circuit for that purpose. *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUDIES 27 (2004); Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010).

---

[3] The amount of attorney's fees represents the difference between the $4,500,000 defendants agreed to contribute towards the "settlement administration fund" and the projected expenses of $1,005,000. Although common benefit counsel have calculated their fees, in part, based on a structure involving a 100% "enhancement" on costs, they acknowledge that the "enhancement" is properly considered part of the attorney's fees rather than costs. R. Doc. No. 689 (citing *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196-97 (5th Cir. 2010) ("We agree with the Appellants that any 'enhancement' of costs is the functional equivalent of a fee.").

[4] The Court agrees that the fee should be determined based on the total value of the $13,500,000 settlement even though the settlement agreement established a separate $4.5 million fund for payment of attorney's fees and expenses. *See Manual for Complex Litig.* § 21.7. To the extent that the amount of money ultimately distributed through the claims administration process is unknown, the Court's rough lodestar cross check will ensure that the fee is reasonable. *Cf. id.* at § 21.71; *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1073-80 (S.D. Tex. Mar. 20, 2012) (Rosenthal, J.).

According to the Eisenberg and Miller study, the mean percentage fee based on published opinion data for client recoveries between $9.7 and $15 million is 22.7%, with a standard deviation of 8.4%. The mean percentage fee based on class action reports data in non-securities cases for the same recovery range is 27.3%, with a standard deviation of 5.2%. The average of the mean percentage fees is 25% with an average standard deviation of 6.8%. The results of the Eisenberg and Miller study support a fee of 25% of the $13.5 million settlement as an appropriate benchmark in this non-securities case. *See In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *20 (E.D. La. Mar. 2, 2009) (Vance, J.) (using the average of the mean fee percentages of the two data sets as a benchmark).

The Eisenberg and Miller study suggests that requests within one standard deviation of the benchmark percentage "should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee." Eisenberg & Miller, *supra*, at 74. The request for common benefit fees in this case falls well within one standard deviation of the mean fee percentage identified in the data sets for client recoveries in the $9.7 to $15 million range. The Court will, nevertheless, proceed to consider whether this benchmark should be adjusted upwards or downwards based on an analysis of the *Johnson* factors.

### 1. The *Johnson* Factors

#### a. Time and Labor Required; Time limitations imposed by the client or the circumstances; Preclusion of other employment by the attorney due to the acceptance of the case

The PSC and associated common benefit counsel were required to expend a significant amount of time and labor in order to complete a wide variety of tasks in a relatively short span of time. This Court imposed rigorous time limitations on the parties in order to ensure an expedited resolution of this matter. In less than two years, the PSC and associated common benefit counsel were required to file numerous pleadings and motions, present arguments on important case

management issues, review hundreds of thousands of documents produced by defendants, retain liability, causation, and damages experts, prepare for ninety depositions, attend numerous status conferences with the Court, prepare witnesses and exhibits for bellwether trials, and negotiate settlements with both TIN and its various insurance carriers.  The attorneys made this possible by, among other things, coordinating rolling document productions for corporate depositions and custodial documents for fact witness depositions, and by conducting up to three depositions simultaneously per day ("triple tracking").

The PSC and associated common benefit counsel expended more than 12,630 attorney hours performing common benefit functions over the course of approximately two years. The Court has independent knowledge of the vast amount of common benefit work performed and the significant resources invested by the PSC and associated common benefit counsel. The total hours expended are neither untoward nor surprising in light of the expedited and demanding nature of this proceeding.  The extensive time and labor requirements, strict time limitations, and preclusion of other employment support the requested 25.89% fee as reasonable in light of the 25% benchmark.

### b.  Novelty and difficulty of the question; The "undesirability" of the case

The claims asserted in this case raised a number of novel and difficult questions of federal and state law.  Among other things, this case presented novel and difficult questions involving conflicts of laws, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Clean Water Act, the Oil Pollution Act, the general maritime law, and a wide variety of tort laws under Texas, Louisiana, and Mississippi law.  The claims raised challenging issues relating to recovery of business losses, punitive damages, and injunctive relief under state and federal law.  Additionally, this litigation

required the PSC to advance the costs of discovery, fund the sampling of the Pearl River, retain the services of various experts to support plaintiffs' liability and damages claims, prepare for bellwether trials, and secure mediation services necessary to achieve a class settlement.  Counsel for plaintiffs have expended and/or reserved a total of $805,000 to satisfy the common benefit and administration costs, which expenses remain unreimbursed.  According to liaison counsel, the case proved to be a high-risk case because the States of Louisiana and Mississippi owned a substantial portion of the affected property and the sampling of the Pearl River revealed levels of contamination that the experts conceded would present no significant ongoing health threat to individuals.  Additionally, the Court notes that TIN and the insurance carriers vigorously defended against these claims and they have denied and continue to deny each and every allegation as well as all charges of wrongdoing or liability.  Accordingly, the Court finds that these factors support the requested 25.89% fee as reasonable in light of the 25% benchmark.

### c.  Skill requisite to perform the legal service;  Experience, reputation, and ability of the attorneys

This Court recognizes the expertise and experience that the members of the PSC and associated common benefit counsel employed in the prosecution of this class action lawsuit. Common benefit counsel have filed declarations outlining their experience, reputation, and abilities and the significant responsibilities they undertook in connection with this proceeding. As discussed in greater detail below in connection with the allocation of attorney's fees, each of the common benefit lawyers contributed significantly to the resolution of this matter.  The Court readily accepts the fact that their diligence and high level of skill made possible a fair, reasonable, and adequate settlement within the time constraints imposed by the Court.  The Court finds that their skill, experience, reputation, and demonstrated ability support the requested 25.89% fee as reasonable in light of the 25% benchmark.

14

### d.  Customary fee; Whether the fee is fixed or contingent; Awards in similar cases

The customary fee and fixed versus contingent factors "primarily deal with the expectation of plaintiffs' attorneys at the outset of the case when measuring the risks involved and deciding whether to accept the case." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 657 (E.D. La. 2010) (Fallon, J.) (citing *Murphy Oil*, 472 F. Supp. 2d at 866 and *Johnson*, 488 F.2d at 718). "In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results." *Id.*  The Manual for Complex Litigation and the Eisenberg and Miller study suggest that a 25% fee award would be well within the range of a customary fee based on a client recovery of $13,500,000.  In light of this Court's finding that the settlement is the product of hard fought negotiations that resulted in a fair, reasonable, and adequate resolution of the claims, the 25% benchmark would appear to be an appropriate indication of a reasonable fee.  The Court notes, however, that when they accepted this case, the common benefit lawyers accepted a certain degree of risk based on the possibility that the punitive damage claims might not succeed, the experts would find no significant ongoing health threat to individuals, and the fact that the States of Louisiana and Mississippi owned a substantial portion of the affected property.  The risk accepted by the PSC and associated common benefit counsel supports the modest .89% increase in the  25% benchmark.

### e.  The amount involved and the results obtained

The diligence of the common benefit lawyers resulted in a $13,500,000 settlement which this Court has found to be fair, adequate, and reasonable.  The settlement will confer a substantial benefit upon the plaintiffs in light of the fact that the common benefit lawyers secured $9,000,000 for the direct benefit of the claimants.  The settlement also achieved an efficient resolution of the matter without the need for expensive bellwether trials and additional delay.

The fact that there were no opt outs or objections to the class action settlement supports a finding that the settlement achieved a favorable result for plaintiffs.  The Court finds that the amount involved and the results obtained support the requested 25.89% fee as reasonable in light of the 25% benchmark.

### f.  Nature and length of professional relationship with the client

The nature and length of the professional relationship between class counsel and the class members does not support an adjustment upward or downward from the benchmark percentage. No members of the PSC or any common benefit counsel have submitted any evidence regarding the nature and/or length of their relationships with the class members.  This Court is not aware of any facts suggesting that the nature and/or length of class counsel's relationship with the class would support any adjustment to the benchmark percentage.

### 2.  Summary of the *Johnson* Factors

An analysis of the Johnson factors confirms that the requested award of 25.89% of the common fund is well within the range of reasonableness for the admirable work performed by the common benefit attorneys in this case.  The percentage fee is within one standard deviation of the benchmark percentage fee set forth in the Eisenberg and Miller study and the .89% increase in the benchmark is supported by almost all of the *Johnson* factors.  Accordingly, the Court finds that the percentage fee method as informed by the *Johnson* factors indicates that the requested fee is reasonable.

### 3.  Lodestar Cross Check

The Court will now conduct a rough lodestar cross check to ensure that the requested amount of attorney's fees is reasonable.  As explained above, "The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a rough cross check on the

reasonableness of the fee arrived at by the percentage method." *See Murphy Oil*, 472 F. Supp. 2d at 859-61.

> The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient . . . . Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate. . . .

*Id.* at 867 (citing Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 GEO. J. LEGAL ETHICS 1453, 1463-64 (2005) and *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir.2005)); s*ee also In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 632 (E.D. La. 2006).

Pursuant to this Court's pretrial order, time summaries were submitted by counsel on a monthly basis and independently reviewed and scrutinized by Mr. Garrett throughout the course of the litigation. The PSC and associated common benefit counsel submitted a total of 15,144.66 hours of which 12,630.29 were ultimately approved by Mr. Garrett. As explained above, the Court finds that the amount of hours approved were reasonably expended in prosecuting these claims. After dividing the requested award for common benefit fees of $3,495,000 by the 12,630.29 accepted attorney hours, the blended hourly rate for the common benefit lawyers is $276.72.

At least one section of this Court has recently found that ranges of $300 to $400 per hour for PSC members, $100 to $200 per hour for associates, and $50 to $80 for paralegal services "reasonably reflect the prevailing rates in this jurisdiction." *Murphy Oil*, 472 F. Supp. 2d at 868-69. Another section of this Court has utilized a blended rate of $250 based on a prevailing market rate of $350 per hour for partners, $150 per hour for associates, and $75 per hour for

paralegals. *In re ETS*, 447 F. Supp. 2d at 633.  In light of this Court's previous discussion of the *Johnson* factors, the Court finds that the blended hourly rate of $276.72 represents a reasonable hourly fee for this jurisdiction when considered as part of the rough lodestar cross check in this particular case.

### 4.  Conclusion

The common benefit lawyers seek an award of common benefit fees in the amount of $3,495,000, which represents 25.89% of the $13,500,000 settlement.  The requested percentage fee is well within one standard deviation of the benchmark percentage fee identified in the Eisenberg and Miller study and it is supported by almost all of the *Johnson* factors.  The hourly rate is also reasonable based on a rough lodestar cross check.  Accordingly, the Court finds that the requested fee should be approved.

### B.  Contingency Fee Contracts of Privately Retained Attorneys

The Court must now consider the extent to which privately retained attorneys should be permitted to recover additional sums directly from the recovery of individual plaintiffs.  It has been suggested that privately retained attorneys hired to navigate the claims administration process stand to recover up to 40% of the $9,000,000 set aside for the claimants through typical contingency fee contracts.  The concern is that such fees would amount to 26.66%[5] of the $13,500,000 settlement fund being paid to privately retained attorneys in addition to the 25.89% award to common benefit lawyers.  For the reasons that follow, this Court is not prepared to accept the possibility that 52.55% of the overall settlement will be paid to attorneys.

---

[5] If privately retained attorneys recovered 40% of the $9,000,000 dedicated to the recovery of the plaintiffs, the $3,600,000 recovered by the privately retained attorneys would represent 26.66% of the $13,500,000 settlement.

The concern regarding privately retained attorney's fees was initially raised by counsel and it was discussed at length with all parties during status conferences held prior to the fairness hearing.  At the recommendation of all counsel, the Court expanded the duties of the special master, Donald C. Massey, beyond his role in the claims administration process for the limited purpose of analyzing whether the Court should limit or "cap" privately retained attorney's fees.

The special master issued a report and recommendation in which he opined that this Court has the discretion to consider limiting private contingency fee contracts in connection with its assessment of the fairness of the class settlement.  He found support for this conclusion in several recent Eastern District of Louisiana decisions in which limits were placed on private contingency fee contracts in the context of class action settlements and multi-district litigation.

The special master undertook an analysis of the *Johnson* factors in relation to the work performed by privately retained attorneys in this particular case.  The special master noted that he did not have the benefit of knowing the precise value of the final award of common benefit fees and expenses. He also could not predict with any certainty the number of unrepresented individuals or the actual terms of private attorney contracts.  However, the special master was able to suggest (but stopped short of recommending) that this Court may choose to reasonably limit private contingency fee agreements to a figure between 20% to 24% of an individual claimant's recovery.[6]  The special master was careful to recommend that any attorneys subject to the limitation should have an opportunity to seek a fee review in the event of extraordinary circumstances.

This Court ensured that all privately retained attorneys received a copy of the special master's report and recommendation and it offered them an opportunity to respond prior to the

---

[6] The special master prepared a number of charts illustrating a range of possible costs and fees in order to demonstrate the impact of a decision to limit privately retained attorney's fees.

fairness hearing.  The Court received only one objection, in which a privately retained attorney stated that he represents 366 plaintiffs who were required to complete extensive surveys and claims forms and provide photocopies of identification, licensing, and medical documents. Counsel argued that "virtually all of the plaintiffs had significant difficulty in reading and understanding" the claim forms, but that "the most difficult problem was a significant number of claimants continually moved and changed their phone numbers which required additional time and effort throughout the entire process, particularly with completion of the first survey forms." Counsel argued that "given the limited recovery of each of the plaintiffs, and the expense incurred by this firm in staff, cost, expenses and independent contractor time, 24% seems inordinately low." Following the fairness hearing, however, counsel advised the Court that he did not intend to pursue his objections to the special master's report and recommendation.[7]

This Court has reviewed the special master's report and recommendation *de novo* and it agrees with the special master's analysis regarding the Court's authority to limit the fees of privately retained attorneys. The Court is well aware of its obligation to protect the interests of the class in its role as a fiduciary and to ensure the reasonableness of attorney's fees.  Indeed, the Fifth Circuit has rejected class settlements approved "without any assurance that attorneys' costs

---

[7] The Court notes that counsel made little attempt to dispute the special master's report and recommendation based on an analysis of the *Johnson* factors.  Although he stated the number of hours various members of his staff expended on the matter, counsel failed to explain the significance of the time expenditures or provide any estimate of the value of his clients' recovery.  The fact that the "most difficult problem" was keeping track of addresses and telephone numbers actually suggests that the work was insubstantial relative to the common benefit work performed in this case.  As explained below, however, to the extent that a proper analysis of the *Johnson* factors would reveal extraordinary circumstances that would justify a departure from the fee limitations, counsel will be permitted to raise such concerns.

and administrative costs will not cannibalize the entire . . . settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195-96 (5th Cir. 2010).[8]

This Court also agrees with Judge Fallon's discussion of the Court's authority to limit privately retained attorney's fees in *In re Vioxx Products Liability Litigation*, 650 F. Supp. 2d 549 (E.D. La. 2009), which was also relied upon to limit privately retained attorney's fees in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, MDL No. 2179, R. Doc. No. 6684 (E.D. La. June 15, 2012) (Barbier, J.); *see also In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, MDL No. 1873, R. Doc. No. 25885 (E.D. La. May 31, 2012) (Engelhardt, J.) (distributing an award among common benefit attorneys and privately retained attorneys); *In Re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL 3230771 (W.D. La. Oct. 31, 2006) (Haik, J.) (same).

In *Vioxx*, the Court's early decision to limit all attorney's fees to 32% of the overall client recovery resulted in a "taffy pull" between the common benefit lawyers and the privately retained attorneys when an award of common benefit fees was sought. *In re Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640, 653 (E.D. La. 2010) (Fallon, J.). After its extensive discussion of the court's authority to limit the fees of privately retained attorneys, the Court resolved the "taffy pull" through an analysis of the *Johnson* factors and "the undeniable fact . . . that the great bulk of the work as well as the expense was borne by the attorneys who performed common benefit work." The Court ultimately decided that 6.5% of the 4.85 billion dollar

---

[8] The parties in this case carefully crafted a settlement that fairly and reasonably provided for a dedicated settlement administration fund to cover the costs of administering the settlement and paying for common benefit fees and expenses. This Court noted during the fairness hearing that it had the ability to ensure the fairness of the settlement through its ongoing assessment of attorney's fees as noted in the special master's report and recommendation.

recovery should be awarded to the common benefit lawyers, leaving the remaining 25.5% to privately retained lawyers.

The basic rationale underlying Judge Fallon's decision regarding attorney's fees in *Vioxx* is also applicable to the facts of this case. Having already determined that the 25.89% common benefit fee award proposed by the common benefit attorneys is reasonable, the Court must now decide the extent to which privately retained lawyers may recover additional sums directly from the recovery of individual plaintiffs. This process generally resembles the Court's resolution of the "taffy pull" in *Vioxx* between the common benefit lawyers and the privately retained lawyers. Because the Court's analysis is not necessarily constrained by a defined upper limit on the percentage for all attorney's fees (which was 32% in *Vioxx*), the Court will determine a fair and reasonable fee for privately retained lawyers based on the *Johnson* factors and the overall value of the $13,500,000 settlement. The goal is to ensure that the total amount of attorney's fees obtained in this case is reasonable in light of the *Johnson* factors and that it satisfies the Fifth Circuit's requirements for approving class action settlements.

### 1. The *Johnson* Factors

The special master has undertaken a well-reasoned analysis of the *Johnson* factors as they relate to the work performed in this case by privately retained attorneys. In reviewing the special master's report and recommendation *de novo*, this Court agrees with the special master's consideration of the *Johnson* factors and adopts it in large part as the Court's own findings as follows.

### a. Time and Labor Required

The special master concluded, and this Court agrees, that the amount of time and effort required to properly file a proof of claim in this case is of consequence. Simply filling out a

proof of claim form requires familiarity with its almost 70 pages. The settlement agreement and resulting proof of claim form contain multiple requisites which must be complied with if one is to successfully prove a claim. For example, real estate claims require proof of ownership, which often includes some form of title opinion, survey data verifying that the property lies within the class area, as well as information regarding the size of the property and the amount of water frontage. With respect to claims involving medical issues, loss of business profit, and diminution of value in connection with real property sales, claimants must submit Rule 26 compliant expert reports.

There are other specific and sometimes strict requirements for supporting documentation. Gathering client information and supporting proof is likely to be labor intensive. The proof of claims form is lengthy, and properly completing a submission is an involved, time consuming process. Given the nature of the settlement agreement and proof of claim form, it is likely that a majority of plaintiffs will be called upon to clarify and/or supplement their initial responses, requiring the lawyers to expend additional time and money. Lawyer involvement and close oversight should bring value to the claimant.

**b.  Novelty and difficulty of the question**

The issues involved in this settlement and claims process are not rudimentary, nor are they exceedingly complex. The biggest challenges for lawyers filing claims for clients seems to be in complying with the detailed provisions of the settlement agreement and proof of claim form. In addition, however, the lawyer must be sufficiently familiar with class action law and procedure in order to provide sound advice and recommendations with respect to whether to opt out or object to the proposed settlement.

**c.  Skill requisite to perform the legal service**

23

A moderate to high amount of skill is required to interpret and comply with the settlement agreement and proof of claim form. In addition, because this is a class action, counsel must be knowledgeable of class action law and procedure and have the ability to evaluate whether to opt a client out of the proposed class or object to it.

### d.   Preclusion of other employment by the attorney due to the acceptance of the case

There is no evidence before the Court that otherwise available business has been foreclosed because of conflicts of interest that occurred as a result of representing a claimant. However, the time and labor required, and the time limitations imposed by the settlement and claims process, are a draw on lawyer and support staff time and resources.

### e.  Customary fee

Neither the special master nor this Court have been presented with any evidence of any of the contingency fee contracts in this case. However, the special master concluded, and the Court agrees, that based upon experience in similar matters, contingency fee contracts ranging from 33% to 40% would be typical.

### f.  Whether the fee is fixed or contingent

Although neither the special master nor this Court has been presented with any evidence of fee contracts or agreements in this case, the special master concluded that it is likely that the overwhelming majority of these cases involve contingency fee agreements.   Assuming that representation is on a contingency fee basis, there would typically be costs advanced by counsel on behalf of individual clients. Costs incurred in this case would include gathering and assimilating medical records, title opinions, land survey opinions, and preparing Rule 26 compliant expert reports for various types of claims. Lawyers who advance these costs are deprived of their capital unless and until there is a recovery.  In addition, items such as staff

support likely utilized in connection with gathering and assimilating evidence and data are indirect costs associated with the handling of claims and such costs are not reimbursed by the client.

### g.  Time limitations imposed by the client or the circumstances

The amended order preliminarily approving this class settlement sets forth a schedule for opting out or objecting to the proposed settlement and submission of claims.  Presumably, prior to making a recommendation on opting out or objecting, a lawyer would need to gather and evaluate his client's individual data and evidence. Such time constraints were modest, but also required a lawyer's prompt attention.

### h.  The amount involved and the results obtained

The amounts involved will range from a relatively small amount to more substantial claims. Because there have been no award determinations at this time, no specific results are available for consideration.

### i.  Experience, reputation, and ability of the attorneys

This factor will vary from lawyer to lawyer. According to the special master, counsel for the litigants demonstrated proficiency and professionalism and the Court agrees with the same.

### j.  The "undesirability" of the case

As the special master recognized, this factor seems more applicable to a common benefit inquiry. The common benefit work led to the proposed settlement. Working with a client to receive money through a claims process may be considered more desirable than undertaking the risk, dedicating the time, and expending the resources necessary to engage in environmental litigation against large companies.

### k.  Nature and length of professional relationship with the client

The special master observed that given the local nature and interest in the events leading to this litigation, it appears that many clients in this case have had pre-existing relationships with their lawyers. There is no discrete source of empirical data available, however, to offer any factual underpinning with respect to the special master's perception of the nature and length of these relationships.

**l. Awards in similar cases**

If viewed as discrete individual cases, predicted fee and cost recoveries would be made pursuant to the lawyers' contingency fee agreements. These typically range from 33% to 40%.  It would be atypical for a fee dispute to arise in an individual case.  Moreover, it would be highly unusual for a court to conduct a review reasonableness of the fee *sua sponte* in an individual case.[9]

---

[9] Although not specifically enumerated as one of the *Johnson* factors or considerations under Rule 1.5 of the Rules of Professional Conduct, it is worth noting that the plaintiffs have been duly noticed and were fairly informed that retaining private counsel would be at their cost and in addition to common benefit fees awarded to PSC counsel.  Specifically, the Long Form Notice provides, in part, as follows:

> For their work on behalf of the entire Class, you will not be charged because these lawyers will apply to the Court for payment of their fees, costs and expenses from the Settlement Administration Fund (see "How Will The Lawyers Be Paid," below). If you want to be represented by your own lawyer in this case, you may hire one at your own expense. If you have hired a lawyer to represent you for claims in this litigation, please contact your lawyer for further information.

> 32. How will the lawyers be paid?

> The $13.5 million settlement amount includes a $4.5 million Settlement Administration Fund to (a) pay for lawyers' fees, costs and expenses that are approved by the Court and (b) administer the settlement. After the Court grants "final approval" of the settlement (see "The Court's Fairness Hearing," below) and any appeals are resolved, Class Counsel will ask the Court for attorneys' fees, costs and expenses to be paid from the $4.5 million

The special master concluded that in the class actions or MDL cases reviewed where courts have capped or limited individual contingency fee agreements, the percentages range from 14.25% to approximately 25%.  As noted by the special master, however, those decisions are highly case sensitive.

### 2.  Summary

The special master suggested that in this particular case, the *Johnson* factors indicate that a reasonable limitation on privately retained attorney's fees would be in the range of 20% to 24%.   Among the most influential factors bearing on the special master's report and recommendation were the following: even though common benefit work facilitated and led to the proposed settlement, there is a modest to significant amount of time and labor required of lawyers to initially prepare a proof of claim form and, in many instances, there will be additional work required to supplement the initial filing; the complex nature of the proof of claim form; the requisite evidence that must be gathered and produced for a claimant to successfully prove a claim; the need for lawyers representing individual clients to possess a solid working knowledge of class action law and procedure, all of which enables the lawyers to advise clients whether to opt out or object; the risk of limited or no recovery; and the consideration of individual client costs that would typically be advanced by lawyers, depriving them of their capital unless and until out of pocket costs are recovered.

This Court agrees with the special master's consideration of the *Johnson* factors in connection with the work performed by the privately retained attorneys and it finds that privately retained attorney's fees should be limited to 20% of any individual claimant's recovery.  First,

Settlement Administration Fund. Attorneys' fees, costs and expenses that are approved by the Court cannot exceed the $4.5 million Settlement Administration Fund.

after considering the *Johnson* factors, a 20% contingency fee represents a reasonable fee for the services provided by the privately retained lawyers, especially when compared to the nature and value of the common benefit work performed in his case.  Second, allowing privately retained attorneys to recover up to 20% of the $9,000,000 dedicated to the claimants will ensure that the overall amount of attorney's fees awarded in the case is no more than 39.22%[10] of the $13,500,000 settlement, which is the maximum amount of attorney's fees the Court finds would be reasonable in this case.[11]  Finally, the Court agrees with the special master that counsel should have an opportunity to request an exception from the limitation based on extraordinary circumstances.

**II.  Expenses**

The PSC and associated common benefit counsel request an award of $805,000 for costs and expenses.  The expenses submitted were independently reviewed by Mr. Garrett and all common benefit counsel confirmed to the Court during the hearing that the amount of cost and expenses was true and accurate.  The Court finds that the expenses submitted are typical and reasonable and that an adequate basis exists for an award of $805,000 in costs and expenses.

**III.  Allocation of Common Benefit Fees**

---

[10] If privately retained attorneys recovered 20% of the $9,000,000 dedicated to the recovery of the plaintiffs, the $1,800,000 recovered by the privately retained attorneys plus the $3,495,000 recover by the common benefit attorneys would represent 39.22% of the $13,500,000 settlement.

[11] An overall percentage fee of 39.22% would exceed by .62% two average standard deviations from the 25% benchmark identified in the Eisenberg and Miller study.  Although the overall amount of fees in the case is high, the increase from the 25% benchmark percentage is justified, for the reasons stated in the Court's consideration of the *Johnson* factors, for both the common benefit attorneys and the privately retained attorneys.  Additionally, as noted by the special master, the amount of privately retained attorney's fees will likely be less than 20% of the $9,000,000 reserved for the claimants because at least 175 proof of claims were timely filed by unrepresented claimants.  Consequently, the cap will ensure that the total amount of attorney's fees does not exceed 39.22%, but the ultimate percentage fee will be somewhat less than 39.22%.

In this case, the common benefit attorneys have reached a unanimous agreement among themselves and jointly recommended an allocation of common benefit fees for this Court's consideration. "Ideally, allocation is a private matter to be handled among class counsel." *Murphy Oil*, 582 F. Supp. 2d at 808 (citing *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D. Ga. 1993) and *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992)). "This is so because class counsel are generally better able to evaluate the weight and merit of each other's contribution to the case." *See id.* Although the common benefit attorneys have admirably agreed upon an allocation, this Court is mindful of its "responsibility to closely scrutinize the attorneys' fee allocation." *See In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). Given this Court's close supervision of the proceedings, it is well-positioned to evaluate the proposed allocation and it finds that it is reasonable for the reasons jointly proposed by the PSC and associated common benefit counsel.

### A.  Thornhill Law Firm

Tom Thornhill served as the Court-appointed liaison counsel for the PSC. In this capacity, Mr. Thornhill was required to coordinate with other counsel to oversee pretrial discovery on behalf of the plaintiffs, conduct hearings with plaintiffs' counsel, and perform a litany of other necessary tasks. He personally conducted 12 depositions, attended 57 hearings, engaged in 20 different settlement negotiations, and his firm attended two public hearings on behalf of the PSC. He also reviewed all draft pleadings, motions, and accompanying memoranda. The Court set a trial date approximately one year from the date of the discharge and Mr. Thornhill adopted an aggressive discovery schedule that included triple-tracking depositions to meet deadlines. Consequently, Mr. Thornhill was restricted from participating in other cases

in which he asserts that the average rate of return is customarily more than double the rate in this case.

Mr. Thornhill's experience and skill contributed significantly to the prosecution of this class action. The Thornhill Law Firm submitted 3,512.10 hours of common benefit work and incurred $150,622.41 in common benefit costs. Based upon the common benefit contributions and the nature of the work performed, an award in the amount of $1,033,565.25 to the Thornhill Law Firm is fair and reasonable.

### B. Howard & Reed

Shawn Reed was appointed co-lead trial counsel for plaintiffs and served as a member of the PSC and class counsel. Ms. Reed is an experienced trial lawyer who has practiced law for 29 years. She has been actively involved in mass tort litigation for 20 years.

Ms. Reed was heavily involved in the prosecution of this action. She scheduled and arranged for all discovery depositions taken by the PSC. Along with her associate attorneys, Jonathan Pedersen and Kyle Del Hierro, Ms. Reed coordinated rolling document production for corporate and fact witness depositions. Her firm coordinated the logistics involved in triple-tracking depositions, and its lawyers conducted and/or sat second chair for the majority of the PSC depositions. During the written discovery phase, Mr. Del Hierro reviewed, tagged for copying, and indexed hundreds of thousands of documents and invoices at opposing counsel's offices. Additionally, Ms. Reed and Mr. Pederson traveled to Austin, Texas, to conduct the Rule 30(b)(6) deposition of TIN.

Ms. Reed personally attended all hearings and status conferences held before this Court and she attended all but one of the weekly discovery conferences before U.S. Magistrate Judge Chasez. Ms. Reed helped assemble and disseminate agenda for weekly discovery conferences,

argued the majority of the discovery motions filed by the PSC, and also argued against protective orders and motions to quash filed by defendants.  She and her associates drafted motions set before Judge Chasez, helped prepare other PSC attorneys for oral argument, participated in PSC conference calls and meetings, and worked with defendants to conduct expert inspections on the Pearl River and at the Bogalusa Paper Mill.  Ms. Reed also discovered the importance of the computerized "Pi System" used at the Bogalusa Paper Mill, and employed a Pi expert after a hard fought discovery battle to perform an inspection inside the Bogalusa Paper Mill on the day the case settled.

Howard & Reed submitted 2,812.76 hours of common benefit work and $97,952.28 in common benefit costs. Ms. Reed personally contributed 1,198.90 hours; her law partner, D. Douglas Howard, Jr., contributed 134.20 hours; Mr. Pedersen contributed 531.16 hours; and Mr. Del Hierro contributed 910.00 hours. Based upon the common benefit contributions and the nature of the work performed, an award in the amount of $785,478.31 to Howard & Reed is fair and reasonable.

### C.  Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.

Irving Warshauer was appointed co-lead trial counsel for plaintiffs and served as a member of the PSC and class counsel.  Mr. Warshauer has been practicing law for over 36 years. As an experienced trial lawyer, he has been involved in other MDL and mass tort cases, and he served as lead trial counsel in a similar class action.

Mr. Warshauer was involved in nearly every aspect of the investigation, development, prosecution, and settlement of this action.  He was on the trial team and he would have had significant responsibilities at the scheduled trial of the bellwether plaintiffs.  He had begun preparations for the trial when the case settled.  Mr. Warshauer was also heavily involved in

drafting the master complaint and the initial plaintiff questionnaires. Along with other motions and pleadings, he drafted comprehensive written discovery to TIN and served as the point person for receiving and distributing defendants' discovery responses. Mr. Warshauer was first chair in five discovery depositions, including the deposition of the president and chief operating officer of TIN in Austin, Texas. Mr. Warshauer also assisted with the analysis of expert reports. Additionally, Mr. Warshauer oversaw PSC financing issues and monitored the litigation and settlement expenses for the common benefit of all class members.  Mr. Warshauer was extensively involved in negotiations with TIN and its insurers to resolve the case and he participated in all mediations and settlement meetings.

Mr. Warshauer's associate attorney, Palmer Lambert, was closely involved in researching and drafting punitive damages and class settlement pleadings. Mr. Lambert served as the point of contact for defense counsel when working to finalize and file motions for preliminary and final approval of the class settlement.  He also secured the services of, and worked extensively with, the lien resolution administrator; coordinated with PSC members to secure class representatives for the settlement; participated in extensive document review; and served as first chair in two depositions and second chair in six others. Mr. Lambert worked with PSC members and the notice administrator to ensure compliance with Rule 23 guidelines.  Lastly, he and Mr. Warshauer worked closely with opposing counsel to finalize the settlement agreement and draft the necessary memoranda to obtain preliminary and final approval.

Gainsburgh, Benjamin, David, Menuier & Warshauer, L.L.C. submitted 1,023.80 hours of common benefit work and $101,484.26 in common benefit costs. Mr. Warshauer and Mr. Lambert personally contributed 747 hours and 241 hours, respectively.  Based upon the common

benefit contributions and the nature of the work performed, an award of $543,660.90 to Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C. is fair and reasonable.

### D.  N. Frank Elliot III, L.L.C.

Frank Elliot served as a member of the PSC and as class counsel. Mr. Elliot has been practicing law for almost 18 years and, as an experienced trial lawyer, he has been involved in a number of MDL and mass tort cases.

Mr. Elliot began investigating the incident shortly after the discharge in August 2011. Mr. Elliot met with fact witnesses and secured a court order to preserve potential evidence. He helped coordinate inspections, sampling activities, and laboratory tests for the Bogalusa Paper Mill, the Waste Water Treatment Facility, and the Pearl River. He worked with others to formulate and develop expert opinions in support of various categories of claimants, including property owners and recreational and commercial fishermen.

Mr. Elliot participated in researching and drafting pleadings, motions, and memoranda. He worked extensively on the master complaint, memoranda in support of class certification, punitive damages, insurance issues, and maritime claims.  He also participated in discovery activities such as drafting discovery requests, taking depositions, and reviewing documents.  He attended status conferences with this Court and assisted in the preparation of arguments and reports to be made at conferences and hearings.  Additionally, as a member of the PSC, Mr. Elliot was involved in the administration of the case and participated in addressing issues from strategy sessions to financial matters.  Finally, Mr. Elliot participated in negotiations with TIN and its insurers to resolve the case, obtain preliminary and final approval of the settlement, and ensure adequate notice and administration of claims.

N. Frank Elliot III, LLC submitted 1,521.10 hours of common benefit work and $103,484.75 in common benefit costs. Mr. Elliot personally contributed 1,450.80 hours and his staff contributed 74.60 hours. The Court finds that an award of $452,947.47 to N. Frank Elliot III, LLC is fair and reasonable.

**E.  Arata Law Office; Lemmon Law Firm; Harrison Law, LLC**

Arata Law Office, the Lemmon Law Firm, and Harrison Law, LLC, jointly participated in the action from its early stages.  As a member of the PSC and as part of the onsite investigation team, William H. Arata was among the first attorneys to investigate the facts and identify potential witnesses before the first lawsuit was filed.  He took photographs and videos at the scene while the incident was in progress. He later secured a watercraft and examined the perimeter of the entire 50-acre site, along with the bayous and tributaries of the Pearl River. Mr. Arata's firm was instrumental in developing the claims of various plaintiff classes and subclasses and he participated in the depositions of both bellwether plaintiffs and named plaintiffs. Additionally, Mr. Arata was involved in discussions with the special master and claims administrator regarding the online claims process.

Mr. Lemon worked with Mr. Harrison and Mr. Elliot to review and evaluate DEQ files, prepare for the depositions of TIN's environmental staff, and develop theories of environmental law and punitive damages. Mr. Lemon consulted with Professor Thanassi Yiannapoulis on behalf of the PSC regarding theories of property damage that were not addressed under Louisiana law. Mr. Lemon worked with experts and other PSC members to develop appropriate sampling locations and protocols.  He also took or assisted with several depositions, including the Rule 30(b)(6) deposition of TIN in Austin, Texas, and he researched and reviewed documents regarding witnesses asserting the Fifth Amendment, adverse inferences, and related issues. At

the Court's request, Mr. Lemon handled the production of the class profile forms and helped the Court notify individual plaintiffs of deficient submissions. Finally, having previously worked with the mediator and lead counsel for TIN, Mr. Lemon assisted early negotiations that eventually led to settlement discussions.

Mr. Harrison provided assistance drafting the initial master complaint and other pleadings, including pleadings related to environmental claims and discovery motions. Mr. Harrison and his staff conducted research and analysis on a number of specific environmental issues. Furthermore, Mr. Harrison participated in site visits; conducted three depositions; participated in a variety of discovery activities; and identified the location of the outfall.

Arata Law Office, the Lemmon Law Firm, and Harrison Law, LLC  jointly submitted 2,088.35 hours of common benefit work and $67,964.70 in common benefit costs. Therefore, based upon the common benefit contributions and the nature of the work performed, an award of $482,469.43 to Arata Law Office, the Lemmon Law Firm, and Harrison Law, LLC is fair and reasonable.

**F.  The Bezou Law Firm**

Jacques F. Bezou was appointed to the trial team for plaintiffs and served as a member of the PSC and class counsel.  Mr. Bezou has more than 40 years of experience as a litigator and the Court knows him to be a gifted trial attorney.  He conducted several critical depositions of TIN employees.  He attended and participated in every status conference, discovery conference, and hearing with the Court.  He was also heavily involved in the settlement negotiations, including attending mediations and continuing negotiations.

Stacy R. Palowsky researched and drafted memoranda on insurance-related issues, attended conferences, and also assisted with discovery-related tasks.  She researched and briefed

nearly all the issues raised by the insurers, including motions to dismiss, compel arbitration, and for summary judgment relating to complex insurance coverage, choice of law, and arbitration issues.  She also attended several depositions related to insurance issues, attended conferences with the Court, assisted with preparing the initial questionnaire to claimants, assisted with discovery tasks, assisted in the drafting and preparation of pleadings unrelated to insurance matters, assisted in the preparation of certain experts' reports, and attended mediation to address insurance issues.

The Bezou Law firm submitted 750.43 hours of common benefit work and $99,363.86 in common benefit costs. Based upon the common benefit contributions and the nature of the work performed, an award of $366,528.59 to The Bezou Law Firm is fair and reasonable.

### G.  Becnel Law Firm, L.L.C.

Daniel E. Becnel, Jr. served as a member of the PSC and class counsel.  Mr. Becnel, worked directly with opposing counsel to overcome initial settlement barriers. Mr. Becnel's experience in negotiating complex class settlements assisted in achieving a settlement amount that exceeded several PSC members' expectations.  He assisted in resolving a number of objections raised by defendants during the negotiation process.  Mr. Becnel also played a key role in involving Jeff Whitlow as claims administrator to the special master.

Mr. Becnel and his associate, Kevin Klibert, took numerous depositions, assisted in the drafting of memoranda, and defended the deposition of Ronnie Penton, a landowner class representative and one of the largest developers along the Pearl River. They worked extensively with the notice expert and the special master's office once the parties approved the settlement.

The Becnel Law Firm submitted 437.75 hours of common benefit work and $95,000 in common benefit costs. Based upon the common benefit contributions and the nature of the work performed, an award of $323,040.32 to Becnel Law Firm, L.L.C. is fair and reasonable.

### H.  The Tammy Tran Law Firm

Tammy Tran served as a member of the PSC and as class counsel.  Tammy Tran participated in this matter since its inception and assisted the PSC in several respects.  Ms. Tran researched legal issues relating to the merge of International Paper and TIN including reviewing the corporate filings of TIN and International Paper and analyzing the  accuracy of their corporate disclosures.  Ms. Tran researched and drafted memoranda relating to maritime law, commercial fisherman claims, gross negligence under Texas law, and choice of law issues involving insurance coverage.   Ms. Tran also participated in the decision-making process regarding discovery strategies, motion practice strategies, deposition strategies, and trial strategies. Her firm participated in numerous settlement discussions and reviewed settlement documents.

Ba Nguyen reviewed documents produced by the U.S. Army Corp. of Engineers related to technical data of the spill site, performed legal research relating to federal and state law, drafted memoranda and motions, and reviewed discovery, including an analysis of the 30(b)(6) deposition transcript.

The Tammy Tran Law Firm submitted 630 hours of common benefit work and $85,000 in common benefit costs.  Based upon the common benefit contributions and the nature of the work performed, an award of $308,181.99 is fair and reasonable.

<u>**Conclusion**</u>

For the foregoing reasons,

**IT IS ORDERED** that the motion for common benefit fees and expenses is **GRANTED**.

**IT IS FURTHER ORDERED** that the proposed allocation is **APPROVED**.

**IT IS FURTHER ORDERED** that contingency fee contracts for privately retained lawyers are limited to 20% of any individual plaintiff's recovery, subject to further review by this Court in extraordinary circumstances.  Any request for this Court to review a particular attorney's circumstances and fee arrangement shall be filed no later than **Tuesday, August, 27, 2013.**

**IT IS FURTHER ORDERED** that any motion to distribute funds shall be filed consistent with the terms of the settlement agreement.

New Orleans, Louisiana, August 21, 2013.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**